52 A.3d 1043

D.W., PLAINTIFF, v. R.W., DEFENDANT.

R.W., THIRD–PARTY PLAINTIFF–APPELLANT, v. D.B., THIRD–PARTY DEFENDANT–RESPONDENT, AND M.W., THIRD–PARTY DEFENDANT FOR DISCOVERY PURPOSES ONLY–RESPONDENT.

Argued April 25, 2012—Decided October 10, 2012.

234

*Thomas J. Snyder* argued the cause for appellant (*Einhorn, Harris, Ascher, Barbarito & Frost, attorneys*).

*John A. Paparazzo* argued the cause for respondent D.B.

*Robert Ricci, Jr.*, argued the cause for respondent M.W.

JUSTICE ALBIN delivered the opinion of the Court.

As his marriage was foundering, R.W. (Richard) came to believe that M.W. (Mark), his nineteen-year-old son, was conceived during an adulterous relationship that his wife had with his former brother-in-law, D.B. (Donald).[1]  When his wife, D.W. (Diane), filed a divorce complaint, Richard filed a third-party paternity action seeking to have Donald declared Mark's natural father and to have Donald reimburse him for the expenses related to Mark's upbringing.  Both Diane and Mark opposed Richard's application for genetic testing to prove parentage.

This case raises an issue of first impression for this Court—the precise standard that must be met to compel genetic testing to prove parentage when there is a presumed father.  The law presumes that the husband is the father of a child born during the course of his marriage.  *N.J.S.A.* 9:17–43(a)(1).  In a parentage action, that presumption of paternity can only be overcome by clear and convincing evidence.  *N.J.S.A.* 9:17–43(b).  In many cases, genetic testing may be the only sufficiently persuasive evidence to overcome the presumption of paternity.  Under *N.J.S.A.* 9:17–48(d), when there is a reasonable possibility that parentage is in doubt, good cause must be shown why genetic testing should not be undertaken.

In denying genetic testing, the family court applied the factors and standard of proof articulated in *M.F. v. N.H.*, 252 *N.J.Super.*

---

[1] We use pseudonyms to protect the confidentiality of the parties.

420, 429–30, 599 *A.*2d 1297 (App.Div.1991), which predated statutory changes to the New Jersey Parentage Act (Parentage Act), *N.J.S.A.* 9:17–38 to –59. The trial court found that Richard was unable to establish by clear and convincing evidence that genetic testing was in the best interests of his then twenty-two-year-old son. The Appellate Division affirmed. Without genetic testing, Richard's parentage claim could not proceed and was dismissed.

We now reverse. This case is not about the wisdom of a father proceeding with a parentage action in the circumstances presented here, but about his legal right to do so under the statute. Neither the trial court nor Appellate Division referenced the applicable statutory provision, *N.J.S.A.* 9:17–48, which addresses the circumstances that warrant an order of genetic testing when parentage is in doubt. Although the factors and standard of proof set forth in *M.F.* may have been suitable to decide the facts in that case, a wider application of *M.F.* is not only problematic, but inconsistent with the dictates of the Parentage Act.

We conclude that the *M.F.* template must be modified and replaced with one broad enough to account for the myriad circumstances that arise in family law cases. We believe that even under the most generous view of the facts from Mark or Diane's perspective, there is an absence of good cause to deny genetic testing. We therefore remand to the trial court for the entry of an order compelling genetic testing.

## I.

### A.

Richard and Diane were married in 1979. During the course of their marriage, Diane gave birth to three children. Mark, the youngest child, was born in April 1987. Diane filed a complaint for divorce in November 2006. In February 2007, Richard filed an amended answer and counterclaim, alleging that Diane fraudulently concealed that he was not Mark's biological father. Richard also filed a third-party complaint against his ex-brother-in-law,

Donald, alleging that Donald was Mark's biological father and demanding from him reimbursement for the monies spent rearing Mark. *See N.J.S.A.* 9:17–55(a). In his answer, Donald neither admitted nor denied paternity of Mark.

In May 2007, Richard moved to compel Mark and Diane to submit to genetic testing. In support of his motion, he submitted a certification detailing evidence that suggested that Diane and Donald had an affair during which Mark was conceived. He also submitted the results of a privately commissioned DNA test that excluded him as Mark's biological father.

In June 2007, on Diane's motion, the trial court dismissed Richard's paternity claim. However, in March 2008, the court granted Richard's motion for reconsideration, reinstated the paternity claim, and directed that a hearing be scheduled to determine whether genetic testing should be ordered. For discovery purposes only, Mark was joined as a third-party defendant.

At the hearing to determine whether genetic testing should be ordered, Richard, Diane, and Mark testified. We summarize the record developed at that hearing.

### B.

In April 2006, Richard and Diane's marriage apparently was going through a rough period. That month, Richard discovered on Diane's phone "some inappropriate text messages" sent from her "current boyfriend." Richard thought his marital woes were related to problems he and Diane were then having with their son, Mark. When he confronted Diane with the text messages, he said, "[T]his is all about [Mark], isn't it." Diane became "very excited, somewhat tearful," and responded, "[W]hy are you dragging [Mark] into this[?]" The next day, Diane began "crying out loud" and stated, "I am so sorry for what I did to you 20 years ago." Several months later, at a small social gathering, Richard witnessed Donald reach for Diane while the two conversed about Mark's troubles, and overheard Donald remark, do "you think he knows something[?]"

By November 2006, when Diane moved out of the marital home, Richard began to notice that Mark did not look like him. Later, during a telephone conversation, Diane made veiled disclosures, telling Richard that he might remember that years earlier there were allegations that she and Donald were "possibly having an affair." At some later point, Diane admitted to Richard that she had sexual relations with Donald five or six times in the latter part of the summer of 1986. Mark was born on April 27, 1987.

With his suspicions raised about Mark's paternity, Richard purchased a home DNA testing kit. At the time, Mark was battling alcohol and drug abuse problems and living with his father. Richard made it clear to Mark that he had to remain clean while living under his roof, and under that guise had Mark provide a DNA sample. Richard submitted the DNA samples to a laboratory for paternity testing. In January 2007, Richard received the results, which revealed that Mark was not his biological son. Richard did not disclose the results to Mark, and the two continued to live together until late March or early April 2008.

At that time, Richard had to go on a short business trip. Because of Mark's alcohol-abuse problems and penchant for late-nights out and partying, Richard did not want to entrust his home to Mark while he was gone. He asked Mark to stay with his mother or a friend in the interim. Mark left, as requested, but as events cascaded, he never returned home.

Around this same time, Mark learned from his cousin that his Uncle Donald might be his biological father. Initially, Richard and Mark continued to maintain a good relationship. Richard drove Mark to and from work because Mark did not have a license due to a driving-while-intoxicated (DWI) conviction. The two had an emotional conversation on Mark's twentieth birthday on April 27. Afterwards, Mark texted Richard: "I love you and always will."

Coinciding with Richard's May 2007 motion to compel genetic testing as part of his parentage action against Donald, Richard and Mark's relationship began to deteriorate. Although for a

while they continued to interact positively—Richard intervened to help Mark regain a job he had lost, and Mark wished Richard a Happy Father's Day in 2007—by February 2008 the two stopped communicating with each other on a regular basis. By August 2008, Richard and Mark's relationship was "almost non-existent." At the same time, Mark had a good relationship with Donald-his uncle and putative biological father. The strain of the divorce and paternity actions took their toll, and apparently Mark resented Richard's badmouthing of his mother. Mark expressed his hostility in a number of text messages.

In a text message dated August 1, 2008, Mark wrote to Richard, "You do not care about me or support me in any way and you are an idiot.... It's been almost two years. It's been almost two years, get over it." That same day, Mark texted, "You are a bad father and you were a bad husband. That's why you are alone. Stop suing [Donald]. Everyone knows it's out ... of spite, and I will testify against you so you don't win." One month later, in an expletive-laced text message, Mark denounced Richard, saying, "[Y]ou bitter piece of sh*t. I pray to God I'm not your kid. You are a worthless—you are worthless to the world."

By April 2009, Richard and Mark had no relationship at all. The divorce and paternity actions also strained Richard's relationship with his daughter, although Richard remained on good terms with his other son. All in all, a once intact family unit was totally fractured. With this family history as a backdrop, Richard, Diane, and Mark each gave testimony on the issue of genetic testing.

Richard maintained that he had "the inherent right to know if [Mark] is [his] biological child." He believed that the truth—taking the "skeleton out of the closet"—would bring closure and permit all three of his children to "re-bond and become a family unit again." He insisted that he wanted to have a continuing relationship with Mark, whom he considered to be his son. However, he indicated that if Donald were found to be the biological father, Donald should be made to financially reimburse him for the twenty years he spent raising Mark.

Diane expressed her opinion that genetic testing would not be in Mark's best interests because Mark told her that "he would like to choose when he has it done." Diane had explained to Mark that Donald might be his biological father. Diane acknowledged, earlier at a deposition, that Mark had a better relationship with Donald than Richard, that Mark would have dinner at Donald's house, and that Richard and Mark no longer talked to each other.

In his testimony, Mark stated that he did not feel it was in his best interests to resolve his paternity at the present time, although he might wish to do so in the future. He expressed that he was "going through a lot in [his] life right now." He stated:

I'm still dealing with paying off fines and stuff for the two DWIs I've had. I still don't have a driver's license. I just don't think that this is something that needs to be brought out in this way. I feel like it's my decision. If I want to know, I should be able to decide on my own time.

Because of his troubled personal life, Mark did not believe it was the "appropriate time" or the legal action "an appropriate way" to resolve his paternity. When asked about the connection between his motor vehicle problems and paying off related fines and his desire to forgo an adjudication of his parentage, he explained that it had to do with his "emotional state of mind."

Mark admitted that he had no relationship at all with Richard. He indicated that if the genetic testing proceeded "there is no possible chance" of reconciliation, whereas "without the testing, there is a possibility that we could have a relationship in the future." Mark, however, testified differently at his deposition. On that occasion, he stated that he did not think there was any possibility he and Richard would reconcile and that he had no wish to do so. Mark also confirmed that he and his Uncle Donald had a "relatively good" relationship. He asserted that at some point he might want to know whether Donald was his father and, if he did, he believed that Donald would cooperate.

## C.

At the conclusion of the hearing, the family court rejected Richard's request for genetic testing, relying on the best-interests-

of-the-child standard set forth in *M.F.*[2] The court found that Richard had failed to prove by clear and convincing evidence that testing to determine paternity was in the best interests of Mark. The court understood that the motion was outcome determinative-that by denying genetic testing the paternity "litigation is virtually over."

Applying the *M.F.* factors, the court acknowledged that "emotional injury is somewhat of an open question," but that without the paternity "litigation hanging over their head," the family could "try and do the best they can to heal." While expressing hope that Richard and Mark could repair their relationship, the court conceded that it might not be possible. According to the court, Mark accepted the presumption of paternity—the presumption that Richard was his father—and was willing to go forward "without knowing with certainty who his father is." The court noted that, although Mark might want to know about his genetic background in the future, he was not concerned about it at that time.

The court considered the "[s]ocietal stigma that may result … [by] placing the child's birth outside the traditional wedlock setting." It chided Richard for creating the "stigma" by asserting that Mark is not his son: "He is the only one in his own mind that's convinced [Mark's] not his son."[3] Notably, the court dismissed the results of the surreptitious home DNA test conducted by Richard on the ground that Mark "had a right to consent." Testimony concerning that test was not allowed.

The court pointed out the consequences if Richard were to succeed in the parentage action—Richard would not appear on the

---

[2] The court rejected the standard proposed by Richard's attorney—that genetic testing should be ordered provided it is not contrary to the child's best interests.

[3] The court also rebuked Richard for raising his paternity claim through pleadings in the initial divorce action—papers that could be open to public view—rather than by filing an action under the Parentage Act, *N.J.S.A.* 9:17–38 to –59, in which the privacy of the parties would be protected.

birth certificate as Mark's father, "[Mark] would lose the right of inheritance from [Richard]," and "everybody would now know with certainty [Mark] is not his son."

The court also disagreed with Richard's assertion that he had a right to know whether Mark was his biological son. "[I]t's not his right to know because the Parentage Act is really focused upon the child, what's right for the child," and, in the case of a minor, "getting the proper support for the child." In the court's view, "[t]he principal purpose of this Act was not to provide a cause of action for a [husband] who found out he wasn't the father . . . to seek reimbursement," although it conceded that Richard's claim is allowed under the Act.

After reviewing all the *M.F.* factors, the family court determined that Richard had not presented clear and convincing evidence that "it is in the best interest of his son [Mark] to go forward with this test."

### D.

At a later hearing, the court granted Donald's motion for summary judgment and dismissed Richard's third-party paternity action. The court noted that, without genetic testing, Richard had no evidence to succeed in his paternity case. The court did not consider the results of Richard's DNA submission to an Oregon company because they were deemed unreliable and because Mark did not consent to the taking of the DNA samples. Moreover, Donald's admission that he had an "intimate relationship" with Diane around the time of Mark's conception was not sufficient proof that Donald was the biological father.

While conceding that the Parentage Act permitted Richard's cause of action for child-support reimbursement against Donald, the court noted that "his legal right to pursue this claim virtually ended the minute he became aware [Mark] didn't want the test." It also rejected Richard's late-filed proposal that the parentage action proceed with a protective order that would keep the genetic test results from Mark. In the court's mind, such an order could

not effectively shield Mark from the results, and the proposal did not alter the court's determination that a paternity test was not in Mark's best interests.

Richard appealed the orders denying genetic testing and granting summary judgment.

## II.

In an unpublished opinion, a two-judge panel of the Appellate Division affirmed. The panel found unmeritorious Richard's arguments that the family court erred in

(1) applying an incorrect legal standard in determining whether a paternity test should be ordered;

(2) denying him the right to pursue discovery by means of a paternity test;

(3) granting summary judgment to Donald and Mark without affording him discovery; and

(4) rendering a decision that was contrary to the weight of the credible evidence.

The panel determined that the family court properly denied the paternity test based on "statutory and case precedent" and "on evidence adduced at a plenary hearing." The panel also concluded that summary judgment was properly granted because Richard presented no evidence to support his paternity claim.

We granted Richard's petition for certification. *R.W. v. D.B.*, 208 *N.J.* 337, 27 *A.*3d 950 (2011).

## III.

The parties are at odds over the precise legal standard a person must satisfy to secure genetic testing when paternity is in dispute. At the heart of this legal contest is the best-interests-of-the-child test set forth in *M.F.* Richard does not contest that the results of genetic testing were essential to proving his parentage claim and that without that information his claim could not survive a summary-judgment motion.

Richard contends that the *M.F.* test should not apply when custody is not at issue and a presumed father seeks reimbursement for child support from the putative biological father of "a 23

year old, adult emancipated child." He maintains that "the facts and circumstances and relief sought in *M.F.* are so materially different from this case" that the use of the *M.F.* test was clearly mistaken. He points out that in *M.F.* a purported father sought to establish paternity of a child-allegedly conceived during an adulterous relationship-over the objections of a married couple, thus presenting the scenario of an outsider seeking to " 'invade' the sanctity of an intact family." Consistent with *M.F.*, the trial court placed on Richard the burden of proving by clear and convincing evidence that genetic testing was in Mark's best interest. Richard argues that the *M.F.* standard should be rejected and that genetic testing should be allowed based on a preponderance-of-the-evidence showing that such testing would not be contrary to Mark's best interests.

Both Donald and Mark argue that the trial court properly applied the standard enunciated in *M.F.* to deny genetic testing in this case. They assert that Richard has cited no authority and given no justification for deviating from that standard. Donald insists that a child's best interests are the fundamental concern of any decision rendered by the family court affecting children—including a decision touching on parentage. Mark emphasizes that Richard should not be permitted to renounce the parentage of "a child whom he has held out as his son" for twenty-two years in order to pursue recoupment of child support from Donald, the putative father.

IV.

Although a family court's factual findings are entitled to considerable deference, *Cesare v. Cesare*, 154 *N.J.* 394, 413, 713 *A.2d* 390 (1998), we do not pay special deference to its interpretation of the law, *N.J. Div. of Youth & Family Servs. v. I.S.*, 202 *N.J.* 145, 183, 996 *A.2d* 986 (2010). That is so because the trial court is in no better position than we are when interpreting a statute or divining the meaning of the law. Therefore, we must

review the legal issue de novo. *Balsamides v. Protameen Chems.*, 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999).

The central question is what requirements must be met to allow for genetic testing to rebut a presumption of paternity in a parentage contest. Donald and Mark present *M.F.* as the controlling precedent. Before reviewing the standards articulated in *M.F.*, we first turn to the relevant statutory language of the Parentage Act. Ultimately, we find that we cannot reconcile the *M.F.* standards with the Act itself.

## V.

### A.

Parents have a legal duty to support their children from birth until emancipation, "which presumptively occurs when the child reaches the age of majority." *R.A.C. v. P.J.S., Jr.,* 192 *N.J.* 81, 94, 927 *A.*2d 97 (2007). One of the central purposes of the New Jersey Parentage Act, *N.J.S.A.* 9:17–38 to –59, is to ensure that children receive the financial support from their parents to which they are entitled. *Wingate v. Estate of Ryan,* 149 *N.J.* 227, 238, 693 *A.*2d 457 (1997). Indeed, the Parentage Act provides the means to identify a child's parent-particularly a father-so that he fulfills his child-support duty. *See* S. Judiciary Comm., *Statement to S. Bill No. 888* (June 21, 1982); *Fazilat v. Feldstein,* 180 *N.J.* 74, 82, 848 *A.*2d 761 (2004).

The Act also provides a vehicle to recoup from a child's father the reasonable educational, medical, and other related support expenses that have been expended by another on behalf of the child.[4] *See N.J.S.A.* 9:17–55(a); *R.A.C., supra,* 192 *N.J.* at 94, 927

---

[4] *N.J.S.A.* 9:17–55(a) provides:

If existence of the father and child relationship is declared, or paternity or a duty of support has been acknowledged or adjudicated under this act or under prior law, the obligation of the father may be enforced in the same or other proceedings by the mother, and child, the public agency that has furnished or may furnish the reasonable expenses of pregnancy, postpartum

A.2d 97.   Any person seeking reimbursement for such support expenses may institute a proceeding against the father if paternity has been "declared," "acknowledged," or "adjudicated" under the Parentage Act. *N.J.S.A.* 9:17–55(a).   "[T]he Parentage Act does not distinguish between a child's direct claim for support [and] an 'interested' person's right to reimbursement for providing child support." *R.A.C., supra,* 192 *N.J.* at 95, 927 *A.2d* 97.   The right of even a presumed father, who has reared a child through his majority, to file such a cause of action against a putative father was not an issue for the trial court and is accepted under our law. *See id.* at 94, 927 *A.2d* 97.

To succeed in a reimbursement lawsuit of the kind filed in this case, the litigant must first identify the biological father.   To that end, the Act allows "any person with an interest recognized as justiciable by the court" the right to bring an action "for the purpose of determining the existence or nonexistence of the parent and child relationship." *N.J.S.A.* 9:17–45(a); *R.A.C., supra,* 192 *N.J.* at 94–95, 927 *A.2d* 97.   However, no action to prove parentage may be instituted "more than 5 years after the child attains the age of majority," *N.J.S.A.* 9:17–45(b), which occurs when he or she turns eighteen years old, *N.J.S.A.* 9:17B–1(a).   Accordingly, the Act effectively establishes a twenty-three-year window in which to file a reimbursement action. *See R.A.C., supra,* 192 *N.J.* at 95, 927 *A.2d* 97; *Fazilat, supra,* 180 *N.J.* at 82, 848 *A.2d* 761.   Mark was twenty years old when the present parentage action was brought and now is twenty-five years old.

The issue here is how does Richard prove that Mark is the biological son of another man when Richard is presumed to be Mark's father.   Richard is the presumed father because Mark was born while Richard was married to Diane. *See N.J.S.A.* 9:17–43(a)(1).   That presumption "may be rebutted in an appropriate

---

disability, education, support, medical expenses, or burial, or by any other person, including a private agency, to the extent that the mother, child, person or agency has furnished or is furnishing these expenses.

action only by clear and convincing evidence," *N.J.S.A.* 9:17–43(b), and that is a presumption not lightly overcome, *see In re Trust Created by Agreement Dated Dec. 20, 1961,* 166 *N.J.* 340, 352, 765 *A.*2d 746, *cert. denied sub nom., Ryan v. Johnson,* 534 *U.S.* 889, 122 *S.Ct.* 203, 151 *L.Ed.*2d 143 (2001).

When a parentage action is brought, one method—perhaps the most effective method—of overcoming the presumption of paternity is through genetic testing. Indeed, there is little question that a genetic test demonstrating non-paternity would meet the clear-and-convincing-evidence standard of *N.J.S.A.* 9:17–43(b) to rebut the presumption of legitimacy. *See, e.g., J.S. v. L.S.,* 389 *N.J.Super.* 200, 204–05, 912 *A.*2d 180 (App.Div.2006), *certif. denied,* 192 *N.J.* 295, 927 *A.*2d 1293 (2007).

## B.

After a parentage action is brought "to declare the existence or nonexistence of the father and child relationship," "a consent conference shall be held by the Superior Court, Chancery Division, Family Part intake service." *N.J.S.A.* 9:17–48(a). The Act provides an avenue of relief if the parties cannot reach an agreement concerning parentage. . In that circumstance, if "blood tests or genetic tests have not been taken," then "the court *shall* order the child and the parties to submit to blood tests or genetic tests *unless* a party claims, and . . . the court finds, good cause for not ordering the tests." *N.J.S.A.* 9:17–48(d) (emphasis added).[5] The Parentage Act further provides that

> [a] genetic test shall be ordered upon the request of either party, if the request is supported by a sworn statement by the requesting party which alleges paternity and sets forth the facts establishing a reasonable possibility of the requisite sexual contact between the parties or denies paternity and sets forth

---

[5] The full text of *N.J.S.A.* 9:17–48(d) makes clear that the statute is probably a frequent tool invoked by county welfare agencies to "help[ ] families deal with the problems posed by fathers who seek to avoid paying child support." *Fazilat, supra,* 180 *N.J.* at 82, 848 *A.*2d 761.

the facts establishing a reasonable possibility of the nonexistence of sexual contact between the parties.

[*N.J.S.A.* 9:17–48(d).]

In short, if a party to a paternity action requests genetic testing and submits a sworn statement establishing a reasonable possibility that he is or is not the father of a child, then the court must order a genetic test *unless* the party opposed to such testing presents "good cause" for not ordering the test. Thus, once the reasonable-possibility threshold of paternity or nonpaternity has been crossed, the default position is genetic testing. The burden is on the party-opponent to make a good-cause showing that genetic testing should not go forward. These simple conclusions follow from the plain text of the statute.

When a plain reading of a statute reveals the Legislature's intent, our inquiry typically comes to an end. *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.2d* 1039 (2005). Only when the statutory language is susceptible to more than one plausible interpretation do we ordinarily turn to extrinsic guides, such as the legislative history of the statute. *See Burns v. Belafsky*, 166 *N.J.* 466, 473, 766 *A.2d* 1095 (2001). This statute, which in its present form was not on the books when *M.F.* was decided, is clearly at odds with the *M.F.* standard. Because of the reliance on *M.F.* by the family court, and the court's failure to refer to *N.J.S.A.* 9:17–48(d), tracing the evolution of *N.J.S.A.* 9:17–48(d) may be instructive to our discussion.

## C.

The historical development of *N.J.S.A.* 9:17–48(d) buttresses the conclusion that, when paternity is legitimately in dispute, the Legislature did not intend to make genetic testing overly burdensome to secure. In its original form, *N.J.S.A.* 9:17–48(d) provided that if an agreement at a settlement conference could not be reached and testing had not been performed, "the court may require the parties to submit to blood tests or genetic tests." *L.* 1983, *c.* 17, § 11. Although the original version appeared to vest

the trial court with broad discretion to order or deny genetic testing, *see* Assemb. Judiciary, Law, Pub. Safety & Defense Comm., *Statement to S. Bill No. 888* (October 7, 1982), subsequent amendments reveal an intent to narrow the range of discretion in the direction of testing when paternity is in dispute.

In 1994, the Legislature amended the language of *N.J.S.A.* 9:17–48(d) from the more discretionary "may require" language of the original version to "the court *shall require* the parties to submit to blood tests or genetic tests if the court determines that there is an articulable reason for suspecting that the alleged father is the natural father." *L.* 1994, *c.* 164, § 2 (emphasis added). In so doing, the Legislature restricted the trial court's discretion to deny genetic testing, limiting it to those situations where the court does not find "an articulable reason for suspecting that the alleged father is the natural father."

*N.J.S.A.* 9:17–48(d) took on its present form in 1998. *L.* 1998, *c.* 1, § 40. As previously described, the current version provides that a genetic test "*shall* be ordered" when a party requests it and produces a sworn statement "establishing a reasonable possibility" of the presence/absence of sexual contact—striking a parallel to the "articulable reason" language of the previous version. *N.J.S.A.* 9:17–48(d) (emphasis added). The current version limits the court's ability to deny such testing only to situations in which it finds "good cause" for doing so. *N.J.S.A.* 9:17–48(d).

Both the plain language and historical evolution of *N.J.S.A.* 9:17–48(d) strongly suggest that the Legislature did not intend to place overly restrictive conditions on the use of genetic testing when parentage is truly in dispute.

### D.

It is also clear that the Legislature did not open the door to genetic testing every time there is a reasonable possibility that paternity is in dispute. The court may still deny a request for genetic testing for "good cause" under *N.J.S.A.* 9:17–48(d). The statute itself does not define "good cause" or set standards for a

"good cause" determination. What constitutes good cause obviously will vary with the unique circumstances of each particular case, but guideposts are needed to direct the way for our trial courts. Before setting a workable definition for the term "good cause" consistent with the goals of the Parentage Act, we now review the standard the trial court employed in denying genetic testing.

The trial court did not follow the general governing principles set forth in *N.J.S.A.* 9:17–48(d). Not even the parties dispute that, based on the evidence of record, there is a "reasonable possibility" that Donald is Mark's biological father. Under the statute, the burden then shifted to the opponents of genetic testing, Diane and Mark, to show that good cause justified the entry of an order denying such testing. However, the trial court placed on Richard—the presumptive father—the burden of proving by clear and convincing evidence that genetic testing was in the best interests of Mark. In denying genetic testing based on the best-interests-of-the-child standard, the trial court relied on the holding in *M.F.* Although the best-interests-of-the-child standard governs most matters involving minors, *Gubernat v. Deremer*, 140 *N.J.* 120, 139, 657 *A.*2d 856 (1995), there is no mention of the best-interests standard in *N.J.S.A.* 9:17–48(d).[6]

Therefore, we must examine *M.F.* to understand the genesis of the test used by the trial court.

### E.

In *M.F.*, the plaintiff filed a parentage action to obtain visitation rights to an infant he claimed to have fathered during an adulterous relationship with a married woman, N.H. 252 *N.J.Super.* at

---

[6] It is also worth noting that, in a recent decision, the Appellate Division stated that "although the 'best interest' standard is used for various determinations involving the well-being of a child, it is not a factor in defining parenthood under the Parentage Act." *In re Parentage of a Child by T.J.S.*, 419 *N.J.Super.* 46, 63 n. 11, 16 *A.*3d 386 (App.Div.), *certif. granted*, 207 *N.J.* 228, 23 *A.*3d 935 (2011).

422, 599 *A.*2d 1297. During N.H.'s pregnancy, the plaintiff told her that if he was the child's father that he intended to act as the father and provide financial support. *Id.* at 423, 599 *A.*2d 1297. To prove that he was the biological father, he requested that the family court order that blood tests be taken. *Id.* at 422, 599 *A.*2d 1297. N.H. objected to any paternity testing. *Id.* at 423, 599 *A.*2d 1297. In addition, she and her husband averred that they were married and continued to live together, and the husband acknowledged the child as his daughter. *Ibid.* The family court ordered paternity tests under *N.J.S.A.* 9:17–51, which stated that " 'upon request of a party *in any contested case* brought under [the Parentage Act] [the court] *shall,* require the child, mother, and alleged father to submit to blood tests or genetic tests.' " *Id.* at 424, 599 *A.*2d 1297 (second alteration in original) (quoting *N.J.S.A.* 9:17–51, *repealed by L.* 1994, *c.* 164, § 8). The Appellate Division reversed, finding the statute inapplicable because the matter was not a judicially sanctioned "contested case." *Ibid.*

The Appellate Division then proceeded to focus on the statutory presumption of paternity that attaches when a child is born during the course of a marriage. It noted that N.H.'s husband was entitled to the benefit of that paternity presumption and that a "strong public policy favor[ed] the preserving of the family unit when neither the mother nor her husband have in any way disavowed the husband's paternity of the child." *Id.* at 425, 599 *A.*2d 1297.

The Appellate Division held that the family court "may not order blood tests or permit the action to continue where the plaintiff's claim of paternity conflicts with the [statutory] presumption" of paternity favoring the husband, "unless the court determines by clear and convincing evidence that it is in the best interests of the child." *Id.* at 429, 599 *A.*2d 1297.[7] To guide

---

[7] The Appellate Division relied on several decisions from other jurisdictions employing the best-interests-of-the-child standard in similar circumstances in

courts in making such a determination, the panel set forth the following factors:

(1) Harm to the child such as emotional injury, distrust, and possible confusion of knowing the parenting father is not the biological father;

(2) Protection of the child's physical, mental, and emotional needs;

(3) The stability of the family relationship and extent of the intrusion that will result from a paternity determination;

(4) The consistency of the putative father's interest in the child;

(5) Societal stigma that may result or be perceived by establishing relationship, including placing the child's birth outside of the traditional wedlock setting;

(6) Continuity of established relationships;

(7) Any extent to which uncertainty of parentage already exists in the child's mind;

(8) The child's interest in knowing family and genetic background, including medical and emotional history.

[*Id.* at 429–30, 599 *A*.2d 1297.]

These factors were clearly crafted to address the circumstances presented in *M.F.*

### F.

We are not bound to follow *M.F.*, and we cannot do so for several reasons. The *M.F.* court's analysis was not constrained by an applicable paternity-testing statute. Here, as discussed earlier, *N.J.S.A.* 9:17–48(d) clearly controls whether genetic testing should be ordered in the present case. Importantly, *N.J.S.A.* 9:17–48(d) in its present form did not exist at the time *M.F.* was decided. In a case in which paternity is at issue, that statute requires genetic testing in the absence of a showing of good cause. Moreover, the Legislature, which is imputed with knowledge of the decisional laws of our courts, could have adopted the best-interests standard of *M.F.* but did not do so. *See Brewer v. Porch*, 53 *N.J.* 167, 174, 249 *A*.2d 388 (1969).

It is also apparent that the standard articulated in *M.F.* was moored to the facts of that case—an outsider asserting parentage who was destabilizing an intact family unit. That best-interests-

---

which an intact marriage was threatened by a person claiming to be the father of a couple's child. *M.F., supra,* 252 *N.J.Super.* at 427–29, 599 *A*.2d 1297.

of-the-child standard appears too narrowly defined to properly guide courts in a host of other circumstances. For example, assume that N.H.'s husband filed for divorce after learning not only of his wife's infidelity, but also of the real possibility that another man had fathered his infant child. Under *M.F.*, the presumption of paternity might keep the husband from having access to the evidence necessary to reveal the truth and to hold the biological father responsible for the support of his own child. It may well be that the non-biological father would be the better parent and that the child's best interests would be advanced by imposing on him parentage and the obligation of support. But while *M.F.* might dictate such an outcome, the Parentage Act, as written, does not.

Finally, the facts before us could not be more dissimilar from those in *M.F.* Here, the presumed father is not acknowledging his child as his biological son; the presumed father has presented evidence that his son was conceived during an adulterous relationship; the family is not intact, but broken at the seams; the presumed father and his son are not on speaking terms and a future relationship presently appears improbable; the son is on better terms with his putative biological father; and, last, the son, now twenty-five years old, is not a minor child. The standard adapted for *M.F.* may have served well in those particular circumstances, but does not appear to serve the overall purposes of the Parentage Act in myriad other scenarios.

### G.

■  Without access to the one piece of evidence necessary to prove his case—genetic testing—Richard will be unable to satisfy the substantive demands of the Parentage Act. He will be unable to muster proof to overcome the presumption of paternity. Thus, it is the discovery phase of this case that may well drive the outcome. Because Richard has shown a "reasonable possibility" that Donald is the biological father, the case turns on whether there is good cause to deny genetic testing.

We must return to where we started. Our mission here is to give effect to the plain language of *N.J.S.A.* 9:17–48(d). However, the Parentage Act does not define good cause. Informed by the purposes of the Act, we must set a good-cause standard for barring genetic testing when the presumption of paternity applies. The 1982 New Jersey Parentage Act was modeled after the Uniform Parentage Act (Uniform Act). *See* S. Judiciary Comm., *Statement to S. Bill. No. 888* (June 21, 1982). For guidance, we now turn to a 2000 amendment to the Uniform Act, Section 608, that addresses the issue before us.[8]

Section 608 of the Uniform Act, in relevant part, provides:

(a) In a proceeding to adjudicate the parentage of a child having a presumed father ..., the court may deny a motion seeking an order for genetic testing ... if the court determines that:

(1) the conduct of the mother or the presumed or acknowledged father estops that party from denying parentage; and

(2) it would be inequitable to disprove the father-child relationship between the child and the presumed or acknowledged father.

(b) In determining whether to deny a motion seeking an order for genetic testing under this section, the court shall consider the best interest of the child, including the following factors:

(1) the length of time between the proceeding to adjudicate parentage and the time that the presumed or acknowledged father was placed on notice that he might not be the genetic father;

(2) the length of time during which the presumed or acknowledged father has assumed the role of father of the child;

(3) the facts surrounding the presumed or acknowledged father's discovery of his possible nonpaternity;

(4) the nature of the relationship between the child and the presumed or acknowledged father;

---

[8] Section 608 of the Uniform Act was adopted by the National Conference of Commissioners on Uniform State Laws in 2000, eighteen years after the Legislature passed the New Jersey Parentage Act and two years after the Legislature's last amendment to *N.J.S.A.* 9:17–48(d). In the absence of a statutory definition of good cause, we must give guidance to our courts to ensure uniform application of that term. Section 608 sets forth a list of factors that address when it is appropriate to overcome the presumption of paternity. It is sensible to consider new provisions of the Uniform Act that assist this Court in confronting an issue of first impression.

(5) the age of the child;

(6) the harm that may result to the child if presumed or acknowledged paternity is successfully disproved;

(7) the nature of the relationship between the child and any alleged father;

(8) the extent to which the passage of time reduces the chances of establishing the paternity of another man and a child-support obligation in favor of the child; and

(9) other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed or acknowledged father or the chance of other harm to the child.

[*Unif. Parentage Act* § 608 (2002).] [9]

Clearly, Section 608 overlaps with a number of the factors set forth in *M.F.* But the factors in Section 608 permit for a broader application to the seemingly endless variety of parentage scenarios that will arise. Although Section 608 requires that the child's best interests be *considered* when determining whether to grant or deny genetic testing, those interests standing alone are not necessarily controlling. As indicated earlier, a husband may learn shortly after a child's birth that the child was conceived during an adulterous relationship. If the husband files for divorce, is genetic testing to be denied because the presumed father would be the better father? We think not in those circumstances. This is not to say that the child's best interests will not control in most cases.

Although the best-interests-of-the-child standard governs most determinations involving children, *Gubernat, supra,* 140 *N.J.* at 139, 657 *A.*2d 856, more is at stake here. The party seeking testing also has an interest in a determination of paternity. Indeed, it may be that in many, if not most, cases where genetic testing is ordered to refute a presumption of paternity, some destabilization of the child's life is inevitable. If this were the only concern, genetic testing would never be ordered to rebut a presumption of paternity. Therefore, the ordinary child's-best-interests test cannot be determinative.

---

[9] The National Conference of Commissioners on Uniform State Laws incorporated minor changes into § 608 in 2002.

In deciding whether good cause has been shown to deny genetic testing under *N.J.S.A.* 9:17–48(d), the approach taken in Section 608 of the Uniform Act strikes a proper balance between the child's best interests, on the one hand, and the interests of the party seeking genetic testing, on the other. The best interests of the child must be *considered* and given due weight, but the ultimate decision will depend on an appropriate weighing of all relevant factors.

Those factors, we believe, should be a combination of those listed in Section 608 and some in *M.F.* We are confident that the factors, when properly identified and weighed by the family court, will best address the greater universe of parentage cases with all their unique scenarios.

■ The factors that must be considered in a court's good-cause determination whether to grant or deny genetic testing are:

(1) the length of time between the proceeding to adjudicate parentage and the time that the presumed or acknowledged father was placed on notice that he might not be the genetic father;

(2) the length of time during which the presumed or acknowledged father has assumed the role of father of the child;

(3) the facts surrounding the presumed or acknowledged father's discovery of his possible nonpaternity;

(4) the nature of the relationship between the child and the presumed or acknowledged father;

(5) the nature of the relationship between the child and any alleged father;

(6) the age of the child;

(7) the degree of physical, mental, and emotional harm that may result to the child if presumed or acknowledged paternity is successfully disproved;

(8) the extent to which the passage of time reduces the chances of establishing the paternity of another man and a child-support obligation in favor of the child;

(9) the extent, if any, to which uncertainty of parentage exists in the child's mind;

(10) the child's interest in knowing family and genetic background, including medical and emotional history; and

(11) other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed or acknowledged father or the chance of other harm to the child.

■ The weight to be given to any individual factor and its interplay with other factors will depend on the circumstances of

each case. To guide courts in the practical use of this standard, we now apply it to the facts of this case to determine whether good cause can be shown to deny ordering genetic testing pursuant to *N.J.S.A.* 9:17–48(d).

## VI.

Richard had raised Mark for almost twenty years when a number of telltale signs led him to believe that his wife had an adulterous affair with his brother-in-law at about the time Mark was conceived. Sometime after Diane moved out of the marital home in November 2006, she told Richard that she had sexual relations with Donald during the late summer of 1986—about the time of Mark's conception. Richard also began to notice that Mark did not look like him. In December 2006, Richard obtained a home DNA kit, secured a genetic sample from Mark under the pretense that it was for monitoring his drug and alcohol abstinence, and submitted the information to a laboratory. In January 2007, Richard received the results of the laboratory test, which established that Mark was not his biological son.[10] One month later, Richard filed his parentage action against Donald through a third-party complaint, an offshoot from Diane's original divorce complaint. No one has disputed that Richard filed the parentage action timely after learning that there was a reasonable possibility that Donald was the biological father. It is not contested that Diane and Donald had sexual relations about the time of Mark's conception.

For twenty years, Richard acted as Mark's father and, even after he believed that he was not Mark's biological father, he continued to serve in that role. Richard expressed that he would like to maintain a father-son relationship with Mark. However, the interpersonal dynamics among all members of Richard's family

---

[10] We do not suggest in any way approval of the surreptitious manner in which Richard obtained a genetic sample from Mark or that the laboratory results from the home testing DNA kit would be admissible as proof of paternity.

unit changed after the filing of the divorce action and Richard's paternity claim. Among the sad consequences of the intra-family strife are that Richard and Mark, as of the date of the genetic-testing hearing, had not been on speaking terms for years.

At a deposition, Mark expressed that he had no desire to reconcile. At the plenary hearing, he stated that the only possibility of a continued relationship with Richard was if he dropped the parentage action against Donald. In the meantime, Mark maintained a relationship with Donald and none with Richard.

Richard asserted that the best way for the family to repair itself was for the truth to be revealed. And, in any event, he claimed that he had an inherent right to know if he was Mark's biological father.

The reality is that the family bonds have been torn asunder; we have no special insight whether they can be repaired, and, if so, under what circumstances. Mark was just shy of his twenty-second birthday at the time of the hearing. He had been living with his mother and was not financially dependent on Richard. Although even at Mark's age, learning that his father may not be his biological parent would be emotionally and psychologically unsettling, certainly an adult is better equipped to handle such news than a young child.

Mark's reason for not wanting to submit to genetic testing was that he was "going through a lot in [his] life," such as contending with the aftermath of DWI convictions. Mark did not articulate some specific emotional or psychic harm that he would suffer if the parentage action proceeded apace. By the time of the hearing, he knew that there was a reasonable possibility that Donald was his father. That uncertainty will linger, not disappear, without testing. Indeed, Mark did not dismiss the notion that he might want to know his genetic history at some future time. However, any parentage action filed by Richard after Mark turned twenty-three would be barred by the Act's statute of repose. Allowing Mark to choose the time of testing would permit him to run the clock out

and extinguish Richard's claim. It bears repeating that Mark had texted Richard that "I will testify against you so you don't win."

We also note that this case does not involve an action for support of Mark, who is well past the age of majority. This case involves a claim for reimbursement of support already provided to Mark. The action will not have a negative financial impact on Mark because the target of the action is Donald, the putative biological father.

The discussion here incorporates many of the eleven factors in the above test. We find that weighing those factors in this case— in consideration with the best interests of Mark—would not satisfy the good—cause requirement of *N.J.S.A.* 9:17–48(d) for denying genetic testing.

We conclude that both the family court and Appellate Division erred in depriving Richard of the one piece of discovery necessary to proceed with his parentage action. As all the parties acknowledge, the only way to overcome the presumption of paternity in this case is through genetic testing.

## VII.

Accordingly, we reverse the judgment of the Appellate Division affirming the family court's orders denying genetic testing and granting summary judgment in favor of Mark and Donald. Underlying the family court's ruling was a thinly veiled displeasure with the very nature of a cause of action that allows for child-support reimbursement after a presumptive parent has raised a child for twenty years. Our role, however, is not to pass judgment on the wisdom of a particular enactment. The Parentage Act provides Richard with a statutory basis for his claim. We now reinstate that claim and remand to the family court for proceedings consistent with this opinion.

Judge WEFING (temporarily assigned), dissenting.

As science advances and family units sunder, courts are thrust into ever more complex areas. This appeal, the product of

emotions generated by the discovery of hidden infidelity and the upending of a worldview reasonably developed over the course of many years, places this Court into such a vortex. Because I am unable to agree with the resolution to which my colleagues have come in this matter, I must dissent.

For purposes of this dissent, I use the fictional names adopted by my colleagues. Defendant Richard and plaintiff Diane were married for more than twenty-five years when Diane filed her complaint seeking a divorce. The divorce litigation was unfortunately acrimonious and, more unfortunately, the parents did not shield the three children born during the marriage from that acrimony. Of those three children, defendant is now completely estranged from two as a result of this litigation.

This appeal focuses primarily upon the youngest child, Mark, born in April 1987. He was nineteen years old at the time his mother filed her divorce complaint in November 2006.

It is apparent from the record that Mark had personal difficulties and struggles even prior to the commencement of the divorce litigation. He had, for instance, been convicted twice of driving while under the influence, *N.J.S.A.* 39:4–50, and had difficulty maintaining employment. There are also references in the record to his perhaps having experienced depression.

In January 2007, Richard filed his initial answer and counterclaim to Diane's divorce complaint. He included in his pleadings claims of infidelity on her part and included a count for intentional infliction of emotional distress, by "concealing a material fact from the defendant regarding one of the parties' children; and fraudulently misleading the defendant to believe this material fact for over twenty years." The following month, in February 2007, he filed an amended answer and counterclaim. This time, however, he specifically focused his count for intentional infliction of emotional distress by claiming that Diane had withheld from him the knowledge that Mark was not his biological son but, rather, the biological son of his former brother-in-law, Donald. At the same time, he filed a third–party complaint against Donald, seeking

reimbursement for the support he had provided to Mark over the years.

Richard said he first became suspicious of Mark's parentage on April 21, 2006, when he discovered in Diane's cell phone what he characterized as inappropriate text messages from an individual he described as her current boyfriend. An argument ensued, during the course of which he saw Mark walking out of the house, and he commented to her, "This is all about him, isn't it?" He said he was referring to Mark's various problems and the need for the family to work out all of its problems if it were to continue as a unit. He said Diane had a very emotional reaction to the remark, becoming very excited and tearful. Richard said the argument continued the following day, and Diane again began to cry and said she was sorry for what she had done to him twenty years earlier.

He said his suspicions were heightened in the fall of 2006 when he and Diane met with his sister and her former husband, Donald, in a local restaurant. The four discussed Mark's most recent conviction for DWI, and Diane indicated Mark's problems were becoming too much for her. Richard said he saw Donald reach out for Diane's hand and ask her if she thought he, Richard, knew "something." Richard pursued the matter with Diane in subsequent conversations, and she confessed that she and Donald in the past had had an affair.

Diane moved out of the marital residence in November 2006. It is unclear from the record whether this occurred before or after she confessed to the affair with Donald.

Based upon these statements, Richard, unbeknownst to Mark, secured a sample of Mark's DNA and sent it to a laboratory for testing. Richard also obtained a second DNA sample from Mark at another point by telling Mark that Richard needed a sample as evidence that Mark was no longer engaged in substance abuse. Because Richard's actions were taken in complete disregard of the Genetic Privacy Act, *N.J.S.A.* 10:5-43 to -49, the test results were not admitted during the course of the litigation.

Because Richard placed his allegations in pleadings he filed as part of the divorce litigation, his claims became widely known, and were certainly known within the family, both immediate and extended, and they provoked strong emotional reactions. Approximately two months after Richard filed his amended answer, counterclaim, and third-party complaint, one of Mark's cousins with whom he had a very close relationship and who happened to be Donald's daughter, told him of Richard's allegation. Mark was shocked and upset and went to his mother who at first told him that Donald had raped her. She later recanted that allegation, and she and Donald admitted they had engaged in an affair during the time that Diane became pregnant with Mark.

Despite his suspicions that Mark might not be his biological son, Richard and Mark continued to live together in the marital home for a period of time. Mark moved out in late March or early April 2007, a move spurred by Richard's telling him that he had to leave for a few days because Richard had to go on a business trip, and he did not want to leave Mark alone and in charge of the house because of his substance abuse problems. Mark moved to his mother's apartment, and it was shortly thereafter that Mark's cousin informed him of Richard's litigation claims. Mark elected not to return to Richard's house.

Mark was deeply upset by the litigation and repeatedly requested Richard not to pursue it. Richard refused Mark's requests, and the relationship between the two, which had previously been unremarkable, completely broke down. My colleagues recite certain text messages Mark sent to Richard, and there is no need to repeat them. I note, however, that Mark testified that they were provoked by Richard's repeated use of coarse and insulting terms to refer to his mother Diane.

Because Mark would not voluntarily participate in further DNA testing, the trial court eventually conducted a plenary hearing to determine whether to grant Richard's request that Mark be ordered to produce a DNA sample that could be tested to settle

the issue of whether Mark was Richard's biological son. Three witnesses testified at that hearing: Richard, Diane, and Mark.

Richard expressed the view that DNA testing would have only a positive impact because it would, in his words, bring "closure." He said he thought he had "an inherent right" to know if Mark was his biological son and, tellingly in my opinion, said he thought there should be some "retribution" for the years he spent raising Mark.

Both Diane and Mark objected to Richard's request for compulsory testing. Mark expressed the view that it should be up to him to decide if he wished to pursue the question of the identity of his father and said he did not feel able to pursue the matter at that point in his life and that he was "going through a lot" and "dealing with a lot of stuff." He stressed that in his view he should be able to make the decision whether, and at what point, to pursue the question of his parentage. He said there would be no possibility of a future reconciliation with Richard if he were ordered to participate in DNA testing.

The attorneys and the trial court all viewed the matter as controlled by *M.F. v. N.H.*, 252 *N.J.Super.* 420, 599 *A.*2d 1297 (App.Div.1991), with Richard bearing the burden to establish, by clear and convincing evidence, that genetic testing was in Mark's best interests. The trial court concluded that he had not met that burden, a determination with which the Appellate Division concurred. That the attorneys and two lower courts framed the issue in this manner is not surprising in light of this Court's recent statement in *Fazilat v. Feldstein*, 180 *N.J.* 74, 88, 848 *A.*2d 761 (2004), that "as in all matters dealing with children, the 'fundamental guiding principle' when considering the issue of paternity is the 'best interest of the child.'" (quoting *D.O. v. R.B.*, 317 *N.J.Super.* 367, 373, 722 *A.*2d 136 (Ch.Div.1997), *aff'd.o.b.*, 317 *N.J.Super.* 323, 722 *A.*2d 114 (App.Div.1998)).

Indeed, it was only when Richard was unsuccessful before the trial court that he adopted the position that the best interest test

enunciated in *M.F.* was inapplicable. The Appellate Division was not persuaded by his new theory, nor am I.

My colleagues have concluded that the focus employed—whether compelled genetic testing was in Mark's best interest—was incorrect in light of the language used by the parentage statute. My disagreement with my colleagues springs not so much from their statutory analysis but the manner in which they apply their conclusion to the present matter.

In my view, any determination of good cause can only be reached after a full consideration of the best interests of the affected child. That must remain the "fundamental guiding principle." *Fazilat, supra,* 180 *N.J.* at 88, 848 *A.*2d 761. In my judgment, proof that it is not in the best interests of the child to order genetic testing would, except in the most extraordinary of circumstances, constitute good cause not to order such testing.

Further, while I agree with the remarks of the trial court that Mark's wishes are not controlling, they are entitled in my judgment to significant weight because he is the individual who will be most deeply affected. Genetic testing may reveal information never contemplated by these parties, and the release of that information may have unforeseen consequences that may reverberate long after this litigation is concluded. To order him to submit to genetic testing because Richard seeks closure and retribution does not, in my judgment, afford sufficient recognition to Mark's own right to exercise some measure of control over his unique genetic pattern.

In *Fazilat, supra,* 180 *N.J.* at 87, 848 *A.*2d 761, Justice Long, writing for the Court, noted first that while the purpose of the Parentage Act is to secure the proper support of children, the best interests of the child in terms of resolving questions of paternity are broader than mere financial support. In my judgment, a similar analysis applies when the child resists pursuing the issue of paternity; the best interests of that child are broader in scope than a private interest in seeking financial reimbursement for monies voluntarily expended over the years to support that child.

My colleagues list the factors a trial court should consider when presented with an issue of whether to order genetic testing in a parentage case. I would add to that list the motivation of the party seeking the testing as well as the motivation of the party opposing it. My colleagues, for instance, express a concern that Mark may be acting only out of a vindictive desire to defeat Richard's claim. I would agree that such a purpose would be improper and should not be countenanced. I am unwilling to ascribe such an improper motive solely on the basis of reading a record.

My colleagues also express a concern that Mark's unwillingness to submit to genetic testing may have the result of entirely precluding Richard from seeking relief because of the statutory deadline for commencing an action under the Parentage Act. This Court recently noted that the deadline contained in *N.J.S.A.* 9:17–45(b) is a statute of repose and not a statute of limitations. *R.A.C. v. P.J.S., Jr.,* 192 *N.J.* 81, 927 *A.*2d 97 (2007). In that case, although we concluded that a putative father's claim for financial reimbursement from the man who was the biological father of the son plaintiff had raised as his own was time-barred, we recognized that there could be "extraordinary circumstances" that might warrant equitable tolling of the statute of repose. *Id.* at 101, 927 *A.*2d 97. We noted by way of example that there was no overt trickery or active deception by the parties in that matter that might justify such equitable tolling. *Id.* at 103, 927 *A.*2d 97. In my judgment, the remedy to thwart the possibility that Mark is continuing in his refusal only until the statutory period has run would be to invoke the doctrine of equitable tolling. Mark is not entitled to rely on a statutory time bar if it is his own conduct that has precluded the action's being brought in a timely fashion.

Further, I cannot so blithely conclude that because Mark is now an adult he should be forced against his will to confront the question of his parentage. I do not quarrel with the general proposition that "an adult is better equipped to handle such news than a young child" (*op.* at 259, 52 *A.*3d at 1058); I question its

relevance. We are not dealing simply with an "adult." We are dealing with an individual who has struggled with substance abuse issues, employment issues, and may have experienced periods of emotional distress in the past. It does not follow that because Mark may have attained the age of majority he has also attained the psychological and emotional stability to absorb without the risk of harm whatever information may be conveyed by genetic testing that is conducted over his objections.

While Richard may have rights both by statute and case law, I cannot conclude that his rights inevitably trump Mark's own rights. There is an exquisite balancing process involved, and, in my judgment, the trial court was in the best position to conduct that weighing. Words typed in a transcript are not always sufficient to convey the depth of the meaning intended by the speaker, particularly in a matter so fraught with emotion and psychological ramifications.

My concerns in this regard are heightened by the nature of the testing that is sought. "Genetic content is unique to an individual and thereby linked to one's identity." June Mary Z. Makdisi, *Genetic Privacy: New Intrusion a New Tort?*, 34 *Creighton L.Rev.* 965, 1020 (2001). "Genetic privacy is a complex subject involving multifaceted scientific, philosophical, emotional, and legal issues." *Id.* at 1025. Courts should tread warily before compelling an adult to submit to genetic testing to satisfy a litigant's claimed "inherent right to know." There is no public interest presented in this litigation; there is no attempt to make whole a public purse that has been depleted because an individual has tried to shirk the financial obligations a parent owes a child. Nor is there a claim for reimbursement for child support paid pursuant to a court order. There is a stated desire for "closure" and for "retribution." I do not perceive the policy interest that is served by ordering an unwilling individual to hand over what is, in essence, his own individual, unique identification merely to satisfy the personal desires of another.

I consider it fundamentally unfair to Mark, who strongly objects to this testing, for this Court to enunciate an entirely new test and then to reach its own conclusions as to whether testing should be ordered, without having given the parties and their attorneys the opportunity to marshal their arguments in light of this new test.

Finally, I cannot help but note that the only way Richard can ultimately prevail in his quest for monetary damages is to prove that the value of the money he spent voluntarily on Mark for the eighteen years after Mark's birth is greater than the value of the father and son relationship the two enjoyed during that same period. In my judgment, that is not an approach the law should foster and encourage.

This case is a tragedy on many levels. A family that was intact is now divided. The unspoken assumptions upon which people lived their lives have been shattered. A child has been unwillingly made aware that his parents possess human frailties and imperfections. This Court cannot heal the wounds the parties have inflicted upon themselves. But I fear the route my colleagues have adopted will leave the parties drowning in the bitterness this litigation has engendered and the attorneys pondering the arguments they could have framed in light of the test just enunciated.

Accordingly, I respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER, Justices LaVECCHIA, ALBIN, HOENS, and PATTERSON—5.

*For affirmance*—Judge WEFING (temporarily assigned)—1.