# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3956-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.T.,

     Defendant,

and

M.B.T.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.A.R.T.
and C.V.V.T.,

     Minors.

_____

Submitted March 5, 2019 – Decided March 19, 2019

Before Judges Yannotti and Natali.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0050-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Kisha M.S. Hebbon, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Casey J. Woodruff, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Nancy P. Fratz, Assistant Deputy Public Defender, on the brief).

PER CURIAM

M.B.T (Max)[1] appeals from an April 17, 2018 Family Part order terminating his parental rights to S.A.R.T. (Scott) and C.V.V.T. (Cara).[2] Max argues that the Division of Child Protection and Permanency (Division) did not prove all four prongs of the statutory "best interests of the child" test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian

---

[1] We use fictitious names for M.B.T., S.A.R.T., C.V.V.T., S.T., P.M., and D.B., to protect their privacy and for ease of reference.

[2] The court's April 17, 2018 order also terminated the parental rights of the children's mother, S.T. (Sally), in accordance with N.J.S.A. 30:4C-15.1, after previously entering a default against her. She has not appealed the April 17, 2018 order.

supported termination in the trial court but, on appeal, argues the Division failed to satisfy the fourth prong. Having considered the parties' arguments in light of the record and applicable legal principles, we affirm the court's order terminating Max's parental rights.

I.

Max and Sally are the biological parents of Scott, born in September 2010, and Cara, born in November 2011. On April 8, 2013, the Division received a referral that Scott and Cara, then two and one years old respectively, were seen crying and hanging out of the window of their home, looking "very dirty." The Division investigated the home and discovered the children "wearing dirty clothing and . . . their faces and feet were black with dirt." The Division caseworker also noted that the home was unkempt, there was no food in the refrigerator and cabinets, and the home had only one mattress.

After completing its investigation, the Division determined that "[e]nvironmental neglect of both children ha[d] been established," and filed a complaint for care and supervision "for the protection and best interests" of Scott and Cara. The court granted the Division's request for care and supervision and ordered Max and Sally to participate in psychological evaluations, take parenting skills classes, and inform the Division if they relocate.

A-3956-17T4

Max submitted to a psychological evaluation with Albert R. Griffith, Ed.D., to address whether he had substance abuse issues, was capable of providing for his family, or had mental health issues impairing his ability to parent. However, he refused to complete the required written portion of the evaluation and clinical interview, complaining that he was tired. Max was provided a follow-up appointment, but he failed to appear and never called to reschedule. Consequently, the evaluation was never completed and Dr. Griffith was therefore unable to make findings regarding Max's need for services or ability to parent. However, he determined there was sufficient information "to warrant a hypothesis of substance abuse."

Thereafter, a Division caseworker visited the family home on June 6, 2013, but discovered that the family had moved without advising the Division. A caseworker attempted to call Max and Sally, but their cell phone numbers no longer worked. On March 13, 2014, the court dismissed the litigation and the Division terminated the case, as Max and the family were still missing, despite litigation and police searches.

Over two years later, on October 6, 2016, the Division received a referral from a New Jersey Transit police officer, who reported seeing Max panhandling outside of Newark Penn Station with Scott while appearing to be under the

influence of narcotics. Max admitted to using heroin and had a hypodermic needle and an empty bag of heroin in his possession. Additionally, the officer noted that he found Scott "shivering and hiding behind a pillar," with dirt all over his face and clothes, and while wearing a short sleeve shirt, despite it being 9:30 p.m., and cold outside. Max told the officer that Sally abandoned the family two months earlier and moved to Arizona. Max was arrested and charged with disorderly conduct, possession of narcotic paraphernalia, and being under the influence of drugs. The police also discovered that Max had pending criminal charges in Florida for receiving stolen property.

Division caseworkers immediately met with Scott at the police station and observed that he had a "strong foul odor," his teeth had noticeable black spots, and were rotted. The caseworker called Max's mother, P.M. (Paula), and learned that Cara was in her care. The Division went to the home Paula was staying at and found a hypodermic needle. A caseworker noticed evidence of recent syringe use on Paula's and another resident relative's arm, a lack of furniture, and insufficient food and clothing in the home for the children. Cara, who caseworkers observed had no front teeth, was removed from the home and placed with Scott in a resource home on October 7, 2016 where they remained through the guardianship trial.

After conducting an investigation, the Division substantiated Max for neglect due to his substance abuse, inadequate supervision, and failure to provide for Scott's and Cara's basic needs. The Division instituted an emergency removal and filed a complaint for custody of Scott and Cara on October 11, 2016. That same day, during a supervised visit with Max, the children, and their aunts and uncle, the Division privately interviewed Max, who admitted to the caseworker that he used heroin and marijuana, and that Scott and Cara had not been seen by a doctor or dentist. Later on October 11, 2016, the court granted the Division custody of the children.

Shortly thereafter, Scott and Cara were assessed by Rose Clark, a Division pediatric nurse. Cara was diagnosed as developmentally delayed and with extremely poor dental hygiene. She also was not current with necessary immunizations and was still bedwetting. Scott suffered from pneumonia, an eye disorder, and rashes on his waist and back. He also had extremely poor oral hygiene and needed vaccinations. Scott was also observed to be malnourished and educationally delayed.

On November 3, 2016, Max attended a preparation session for an upcoming family team meeting, when the caseworker noted Max "appeared to be under the influence." The meeting was rescheduled, but Max failed to appear.

6

Thereafter, on November 14, 2016, Max participated in a psychological evaluation with Elizabeth Stilwell, Psy.D., to assess his "parenting ability, mental status, and treatment needs." Dr. Stilwell recommended that Max complete a certified drug and alcohol counselor evaluation and comply with any recommendations, attend parenting skills training, obtain appropriate housing for his children, and maintain a stable source of income. Because Max was homeless, the Division wrote to the Essex County Division of Welfare and requested medical and financial assistance for him.

On February 6, 2017, the court held a fact-finding trial and determined Max abused or neglected his children, pursuant to N.J.S.A. 9:6-8.21(c)(2), N.J.S.A. 9:6-8.21(c)(4)(a), and N.J.S.A. 9:6-8.21(c)(4)(b). The court concluded that Max's failure to seek medical and dental treatment for his children resulted in "protracted disfigurement to both [Scott] and [Cara] in the form of rotting and missing teeth," and "impairment of [Scott's] ability to chew, a contributing factor to his diagnosis of malnourishment." The court also determined Scott was "placed in imminent danger by [Max's] failure to provide proper supervision" when he was panhandling outside of Newark Penn Station while under the influence and with Scott in his care, who was not wearing weather-appropriate clothing.

7

While the children were in the Division's custody, the Division referred Max for numerous substance abuse evaluations, but he consistently failed to appear, missing over five appointments. On March 21, 2017, he appeared for a scheduled evaluation, but failed to provide a urine sample, stating he "was unable." Max was then referred to an intensive outpatient program at St. Michael's Hospital three days later, but failed to attend the intake appointment.

The Division arranged for Scott and Cara to participate in psychological evaluations with Leslie J. Williams, Ph.D. Dr. Williams noted the children "were subject to significant emotional and physical neglect that has caused feelings of abandonment, anger, fear, and loss" and recommended they receive trauma-focused psychotherapy "to process their sense of loss and anger."

The Division arranged supervised visits between Max, Scott, and Cara but Max consistently arrived late or failed to attend. Despite his failure to attend visits regularly or in a timely fashion, the Division continued to ensure visits were scheduled. When Max was able to attend the visits, the children were happy to see him.

On May 9, 2017, at a supervised visit at the Division's office, Max absconded with the children. The Newark Police Department aided in the search for Max and the children, but were unable to locate them. A day later, Max,

Scott, and Cara were found in Boston, Massachusetts, after the Division contacted the Massachusetts Department of Children and Families. The children were returned to their resource home and Max was arrested and remained incarcerated through the trial. Max's supervised visitation was suspended as a result of his incarceration.

In May and June 2017, the Division arranged for further medical evaluations of Scott and Cara by Monica Weiner, M.D., of the Metro Regional Diagnostic and Treatment Center. The evaluation revealed that Cara's "extensive cavities . . . required that six of her teeth be pulled" and were caused by her never seeing a dentist. Scott's evaluation similarly revealed that dental neglect resulted in the removal of sixteen of his teeth, which caused him to be unable to chew, contributing to his malnutrition. Additionally, Dr. Weiner noted that Cara and Scott suffered from asthma. Scott was also diagnosed as suffering from low weight and coloboma, or missing tissue in his eye. According to Dr. Weiner, these conditions went untreated due to Max's medical neglect of Cara and Scott.

The Division proposed a permanency plan of adoption and the court held a permanency hearing. After considering the parties' arguments, the court found the permanency plan acceptable, noting that Max failed to attend intensive

outpatient treatment, failed to comply with parenting skills training, and had no known arrangements for housing following his release from incarceration.

Thereafter, the Division filed a complaint for guardianship and termination of Max's and Sally's parental rights. The Division requested that Max undergo a psychological evaluation while incarcerated to determine the "proper assessment as to . . . specific therapy, or counseling or treatment," but he refused to participate in the evaluation.

Despite his refusal, the Division attempted to connect Max to social services while he was in jail. In this regard, the Division wrote to the Director of Social Services at the Essex County Jail and explained that Max was in need of substance abuse treatment, parenting skills training, and individual therapy. Although the Division also met with Max and explained how to obtain services while incarcerated, he never sought any services.

Max requested visits with Scott and Cara at the jail. Cara stated she did not wish to visit her father. The Division consulted with Scott's therapist, who was concerned that Scott developed an "infatuation with guns and violence" and opined the jail environment might trigger Scott's trauma and cause "reactive behavior." Based on the therapist's opinion, the court denied Max's request to visit with Scott and honored Cara's request not to visit her father.

A-3956-17T4

While the children were in the care of their resource parents, the Division conducted regular visits. The children repeatedly stated they were doing well and the Division had no concerns regarding the care the resource parents were providing. The resource parents expressed their willingness to adopt Scott and Cara.

On January 19, 2018, Zachary Yeoman, Psy.D., conducted a bonding evaluation between Scott, Cara, and their resource parents. Dr. Yeoman observed that the children "remained in close physical proximity" to the foster parents, who "demonstrated flexibility and patience." The children called the foster parents "Daddy and Mommy," and "indicated that they liked living with [them]." Dr. Yeoman found that "a strong, psychologically healthy bond is forming between them," and "expect[ed] their bond to be fully formed in the near future." He also determined that "[i]f the children were to be removed from their foster parents . . . they would experience substantial harm." Significantly, Max declined to participate in a bonding evaluation with his children.

In April 2018, the court conducted a one-day trial on the Division's guardianship complaint. At trial, the Division relied on documentary evidence and the testimony of Comfort Abogan, a Division caseworker, Clark, and Dr. Yeoman, who was qualified as an expert in psychology and bonding. Sally

defaulted and did not appear for trial. Max did not testify, nor did he offer any documentary evidence. The Law Guardian presented no witnesses.

In a detailed twenty-six page written decision, Judge James R. Paganelli found the Division proved by clear and convincing evidence all four prongs of N.J.S.A. 30:4C-15.1(a). The court made specific credibility findings and determined that all three Division witnesses were credible. With respect to Dr. Yeoman, the court characterized his testimony as "direct, knowledgeable and informative." Accordingly, Judge Paganelli entered a judgment terminating Max's and Sally's parental rights to Scott and Cara and awarded the Division guardianship of the children. Max's appeal followed.

## II.

On appeal, Max argues that the Division failed to satisfy its burden under the statutory "best interests of the child" test. Contrary to its position at trial, the Law Guardian claims that as to prong four, "the trial court inappropriately found by clear and convincing evidence that termination of [Max's] parental rights will do not do more harm than good." We disagree with Max's argument, and with the Law Guardian's position as to prong four, [3] and affirm substantially

---

[3] Despite claiming that the Division failed to clearly and convincingly establish prong four, the Law Guardian's brief inconsistently argues that "the trial court's

for the reasons set forth by Judge Paganelli in his well-reasoned and thoughtful written opinion.

Initially, we note that the scope of our review in an appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). Moreover, due to its expertise in family matters, the Family Part's factual findings "are entitled to considerable deference." D.W. v. R.W., 212 N.J. 232, 245 (2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

III.

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). The right to have a parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v.

decision to terminate [Max's] parental rights must be affirmed as the Division proved by clear and convincing evidence that termination of parental rights was in the children's best interests." In addition, the Law Guardian maintains that the Division established prongs one, two and three by clear and convincing evidence.

R.G., 217 N.J. 527, 553 (2014). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature codified the test for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

14

A.      Prong One

Under the first prong, harm to the child "must be one that threatens the child's health and will likely have continuing deleterious effects on the child." K.H.O., 161 N.J. at 352.  In addition to physical abuse and neglect, the mental and emotional health of the child should be considered.  N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-05 (1986).  "[T]he focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development."  K.H.O., 161 N.J. at 348.

Here, there was substantial, credible evidence supporting the court's finding that the children's "safety, health, or development have been or will be endangered by their relationship with [their biological parents]."  From an early age, Max neglected Scott's and Cara's physical and emotional needs.  It was undisputed that Max never took the children to a dentist or doctor.  As a result, Scott and Cara's teeth decayed to the point that they needed to be removed and which contributed to Scott's malnutrition.  Further, Max was observed under the influence of narcotics and panhandling with Scott, who was not properly dressed for the cold weather, which endangered his safety.  The children's safety was also put at risk when Max absconded with them to Boston.  In sum, there was overwhelming evidence to support the court's finding that Scott and Cara's

15

safety, health, or development were and will continue to be endangered by their relationship with Max.

B.    Prong Two

Max argues that the Division failed to establish that he was unwilling or unable to eliminate the harm faced by his children, or to provide them with a safe and stable home. He asserts that the court failed to consider his participation in the psychological evaluation with Dr. Stilwell, his participation in a substance abuse evaluation, and his relationship with his children prior to his arrest. In addition, Max relies on N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527 (2014), for the proposition that his incarceration is not a basis to terminate his parental rights. We disagree with all of these arguments and agree with Judge Paganelli that the Division clearly and convincingly satisfied prong two.

The second prong relates to parental unfitness and "focuses on the parent's ability to overcome the harm to the child." K.H.O., 161 N.J. 352. Although this prong "more directly focuses on conduct that equates with parental unfitness," prongs one and two are related and "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of DMH, 161 N.J. 365, 379 (1999).

16

With respect to prong two, the court found that Max was "unable or unwilling to eliminate the harm facing" Scott and Cara, and "was unable to provide a safe a stable home for the children." There was substantial credible evidence to support these findings. As Judge Paganelli noted in his opinion, Max failed to attend or engage in services, including those recommended by Dr. Stilwell. He did not appear for numerous, scheduled substance abuse evaluations and the intensive outpatient program at St. Michael's Hospital. Max also refused to engage in substance abuse treatment, individual therapy, and parenting skills services while he was incarcerated, despite the Division's efforts to connect him with those services.

The court noted that at the time of trial, Max remained incarcerated related to his unauthorized removal of the children to Massachusetts. The court noted that the criminal charges were not resolved and the length of his incarceration was unknown. Based on those comments, Max maintains that court's prong two finding was contrary to our holding in R.G. We disagree.

In R.G. we held that although incarceration alone is insufficient to establish parental unfitness, "particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard" supports termination of parental rights of an incarcerated parent. R.G., 217 N.J.

17

at 556. Here, the court did not terminate Max's parental rights based on his incarceration. To the contrary, Judge Paganelli correctly noted that during his incarceration, Max had not engaged in any services, despite the Division's efforts to assist him. That Max did not avail himself of any and all opportunities to participate in services that may eliminate the harm facing Scott and Cara was particularly relevant to the prong two analysis.

C.    Prong Three

Max next argues that the Division failed to make reasonable efforts to provide him with services aimed at his reunification with the children. Specifically, he claims the Division failed to ensure he "received substance abuse treatment, parenting skills classes, and visits with his children" while incarcerated. Again, we disagree.

"The diligence of [the Division's] efforts on behalf of a parent is not measured by their success." DMH, 161 N.J. at 393. Instead, the Division's "consistent efforts to maintain and support the parent-child bond are central to the court's determination." Ibid. Courts should consider the Division's efforts "that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the

A-3956-17T4

placement of the child into foster care." <u>K.H.O.</u>, 161 N.J. at 354; <u>see</u> <u>also</u> N.J.S.A. 30:4C-15.1(c).

Here, the court found that the Division provided Max with services "specifically tailored to [his] needs." As Judge Paganelli noted, Max was provided with substance abuse evaluations and treatment, family team meetings, and services for the children. Further, the Division made reasonable efforts to provide Max with services while he was in jail. It wrote to the jail's director of social services to inform that Max was in need of services and caseworkers also visited him in jail twice to explain how to obtain services in jail. Max, however, elected not to seek out the services as recommended.

Additionally, the Division considered if the children should visit Max at the jail and determined it would not be appropriate. Cara expressed an understandable reluctance to visit her father at the time. Further, the Division conferred with the children's therapist, who expressed concern that Scott's trauma would be triggered by the jail environment. Under the circumstances, we disagree with Max that the Division's decision not to permit visitation at the jail was unreasonable or affected his reunification. Prior to his incarceration, Max failed to regularly attend visits and failed to take necessary steps to correct his parental deficiencies. Thus, there was substantial credible evidence

19

supporting the court's finding that the Division made reasonable efforts to provide Max with services aimed at overcoming the circumstances "that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354.[4]

D.    Prong Four

Finally, Max asserts that although he is not the "perfect father due to his pending criminal charges, substance abuse, and financial issues," his children "will suffer more harm than good if they are deprived of a biological father who deeply loves and cares for them." The Law Guardian argues that the children "love their father and want to be with him" and "wish their father could live with their resource family and [their] resource parents could take care of their father and them." Based solely on these sentiments from the children, the Law Guardian claims that the Division failed to satisfy prong four. We disagree with

---

[4] The court also "consider[ed] alternatives to termination." Judge Paganelli concluded that Kinship Legal Guardianship (KLG) was inappropriate, as "the resource [parents] . . . expressed an unequivocal desire to adopt and there [was] no indication that [Max] or [Sally] have any ability to properly care for [Scott] and [Cara]." He also noted that independent living was inappropriate as Scott and Cara were "too young for this alternative." Finally, Judge Paganelli determined that the children did not meet the criteria for other long-term specialized care, which is used when no appropriate family or "less restrictive living arrangement can meet [the child's] needs for care and treatment." Neither Max nor the Law Guardian challenge these findings on appeal.

A-3956-17T4

both Max and the Law Guardian and conclude that Judge Paganelli correctly concluded that the Division clearly and convincingly provided that terminating Max's parental rights will not do more harm than good.

Prong four "serves as a fail-safe" against termination even where the remaining standards have been met. G.L., 191 N.J. at 609. The critical inquiry "is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008). Typically, "the [Division] should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the [resource] parents." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 453 (2012) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)). "[W]here it is shown that the bond with [the resource] parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy" the fourth prong. K.H.O., 161 N.J. at 363.

Here, in considering the fourth prong, Judge Paganelli first concluded that Max and Sally "are not fit to parent." He correctly noted that when a parent is

unfit, "the proper inquiry . . . focuses on the [children's] need for permanency, and the parent's inability to care for the child in the foreseeable future." The court also noted that because Max refused to submit to a bonding and psychological evaluation, and Sally never appeared to set forth any plan for caring for the children, there was no competent evidence of a bonded relationship between Max and the children. Judge Paganelli also relied on Dr. Yeoman's unrebutted expert opinion that the resource parents had cared for the children since their removal in October 2016 and the children were forming a "strong, psychologically healthy bond" with them that would soon be fully formed. According to Dr. Yeomen's testimony, which the court credited, the children would experience substantial harm if removed from their resource parents.

Relying on J.C., Max argues that the Division failed to establish that Scott and Cara would suffer "serious and enduring emotional or psychological harm" if separated from their resource parents. J.C., 129 N.J. at 19. Max relies on Dr. Yeoman's testimony that it generally takes twenty-four months for children of Scott and Cara's ages to have a fully-formed bond with their caregiver, and thus argues that, because the bond had not yet fully formed, the harm caused by the children's removal from their foster parents would not be serious and enduring

22

and could be mitigated by placement with another caring, competent caregiver. We conclude that J.C. is inapplicable here because the court found Max to be an unfit parent who was not capable of caring for the children at the time of trial or in the foreseeable future.

In J.C., the Division did not assert that the defendant mother was then unable or unwilling to care for her children, but only that her rehabilitation had come too late, that her children had become bonded to their resource parents, caused by her conduct, and they faced serious harm if separated from their resource parents. Id. at 8, 25. The Supreme Court explained that when the Division "seeks termination of parental rights, not on grounds of current unfitness but because of potential harm to the child based on separation from a foster parent with whom the child has bonded, the quality of the proof adduced must be consistent with the interests at stake." Id. at 18. Acknowledging that "prolonged inattention by natural parents that permits the development of disproportionately stronger ties between a child and foster parents may lead to a bonding relationship[,] the severing of which would cause profound harm . . . attributable to the natural parents," the Court nevertheless held it was not enough "[t]o show that the child has a strong relationship with the foster parents or might be better off if left in their custody . . . ." Id. at 18-19. Instead, the Division

"must prove by clear and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm." Id. at 19.

Unlike in J.C., Max was not a fit natural parent ready to resume custody. Therefore the court was not required to determine if it should return Scott and Cara to a fit parent, as in J.C. Here, the Division asserted, and the court found, that neither Max nor Sally were capable of functioning as Scott and Cara's parents, a situation that was unlikely to change in the foreseeable future. Because the Division proved Max and Sally's "current unfitness," id. at 18, it was not also required to show "by clear and convincing evidence that separating [Scott and Cara] from [their] foster parents would cause serious and enduring . . . harm." Id. at 19. Instead, the critical question was whether Scott and Cara "will suffer a greater harm from the termination of ties" with Max "than from the permanent disruption of [their] relationship with [their] foster parents." K.H.O., 161 N.J. at 355.[5]

---

[5] We also observe that based on the parties' briefs, the children remain with the resource parents, are doing well in their care, and the resource parents remain committed to adoption. Dr. Yeoman testified that a "strong, psychologically healthy bond [was] forming" between the children and their resource parents. Based on the date of removal, Scott and Cara will now have been in their care for approximately twenty-nine months, beyond the twenty-four months

Further, in evaluating the fourth prong, "an important consideration is '[a] child's need for permanency.'" F.M., 211 N.J. at 453 (alteration in original) (quoting M.M., 189 N.J. at 281). "Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001). Here, the evidence at trial supported the court's conclusion that neither Max nor Sally could satisfy the children's need for permanency.

Finally, we also reject the Law Guardian's position that the Division failed to satisfy the fourth prong. We note that the Law Guardian does not challenge any of the court's factual findings, nor does it claim that Max is a fit parent ready to care for the children. To the contrary, the Law Guardian advocates for reversal, so that Max can be cared for by the resource parents, consistent with the wishes of Scott and Cara. Further, the Law Guardian does not claim that the now twenty-nine month bond between the children and the resource parents is not fully formed or that the resource parents are not properly caring for the children. While we appreciate the children's affection for their father, based on

---

necessary for the creation of a fully-formed bond that would result in serious and enduring harm if the children were removed from their care.

the facts adduced at trial, maintaining that parental relationship will clearly and convincingly do more harm than good.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION