# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2083-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

R.C.,

      Defendant-Appellant/
Cross-Respondent,

and

D.S.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF Ra.C., Minor,

      Respondent/Cross-Appellant.

_____

      Submitted April 4, 2019 – Decided May 3, 2019

      Before Judges Simonelli and Firko.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0122-17.

Joseph E. Krakora, Public Defender, attorney for appellant/cross-respondent (Beth A. Hahn, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for respondent/cross-appellant (David B. Valentin, Assistant Deputy Public Defender, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Jessica M. Steinglass, Deputy Attorney General, on the brief).

PER CURIAM

Defendant R.C. (Rhonda),[1] the biological mother of Ra.C. (Robert) born in December 2006, appeals from the December 21, 2017 judgment of guardianship, which terminated her rights to the child.[2] On appeal, Rhonda contends the trial judge erred in finding respondent New Jersey Division of Child Protection and Permanency (Division) proved all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. She also argues that a

---

[1] Pursuant to Rule 1:38-3(d), we use initials and fictitious names to protect the confidentiality of the participants in these proceedings.

[2] Robert's father is unknown and his rights were terminated during the guardianship proceeding.

subsequent judge erred in denying her motion for parenting time pending appeal. The law guardian cross-appeals and challenges the judge's findings on prongs three and four. We affirm.

We will not recite in detail the history of the Division's involvement with Rhonda. Instead, we incorporate by reference the factual findings set forth in Judge Anthony V. D'Elia's November 21, 2017 oral opinion.

## I.

Robert was removed from his mother shortly after his birth due to her illicit drug use and homelessness. He was placed in a specialized provider service home and classified as medically fragile. The Division explored several relative placement options but none were able to care for Robert. At one point, Rhonda was reunified with Robert, but she was incarcerated several times since his birth and was in prison during the guardianship trial that took place in October 2017. Rhonda's brother, John, became Robert's legal guardian when the child was five years old. Robert suffers from mental health issues and behavioral problems, including Attention Deficit/Hyperactivity Disorder, Oppositional Defiant Disorder, Mood Disorder, and Reactive Attachment Disorder. Robert was non-compliant in taking his medications, became aggressive, and expressed suicidal ideations. John and his pregnant wife could

not attend to Robert's needs, and they were unable to take him to his psychiatric appointments or discipline him. After Robert was admitted to Hoboken University Medical Center for an evaluation, John was unwilling to take him home. Rhonda was incarcerated at the time and the Division effectuated Robert's emergent removal. Robert's older brother, Paul, expressed an interest in caring for him, but never appeared in court as requested to pursue same.

During the trial, the Division presented testimony from two experts and two caseworkers. Neither expert supported reunification. Dr. Robert James Miller, II testified that Rhonda failed to articulate a relapse prevention plan or parental planning for Robert. She has poor cognitive functioning and a personality disorder. There was a "peer-like" interaction between Rhonda and Robert, and she sought attention from him, resulting in a role reversal and "psychological intrusiveness." Permanency was immediately required for Robert to overcome his developmental delays, according to Miller.

Dr. Robert Kanen also testified on behalf of the Division and opined that Rhonda is "proven to be undependable and unreliable," and has "serious parenting deficits." He expressed concern that Rhonda "would expose the child to an unnecessary risk of harm," and because of his special needs, he requires "somebody who is consistent, predictable and reliable" and not involved with

A-2083-17T3

drugs. The Division's caseworkers testified that, although Robert had been placed in a home where adoption was possible, the Division's goal was select home adoption.

The law guardian proffered an expert, Dr. Antonio Burr, who testified that Rhonda might be able to parent in the future if she complied with services, refrained from using drugs, avoided criminal activity, and obtained employment. Burr testified that Rhonda had a sixteen-year history of heroin abuse, but she participated in services while she was incarcerated at Edna Mahan Correctional Facility (EMCF). Nonetheless, he opined that Rhonda's likelihood of successful parenting was "minimal." She would need to live a drug-free lifestyle for one to two years before being considered as a caretaker.

Rhonda testified she would be released from prison in February 2018. Robert asserts he does not want to be adopted. Rhonda's expert, Dr. Gerard Figurelli, testified he "could not articulate any circumstances under which he would recommend termination of parental rights," a position which the court outright rejected. He also advocated for a therapeutic placement for Robert instead of termination of parental rights.

In its oral opinion, the court explained that even if Rhonda was not incarcerated, it would be unsafe to place Robert with her based upon Rhonda's

A-2083-17T3

history of substance abuse, instability, and multiple incarcerations. Lack of an adoptive home for Robert did not prevent termination of parental rights. Subsequent to the trial, Robert's resource parents decided against adopting him.

II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth and Family Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth and Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth and Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth and Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth and Family Servs.

v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006) (citing Cesare, 154 N.J. at 411-13).  No deference is given to the court's "interpretation of the law" which is reviewed de novo.  D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence.  In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999).  "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests."  Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

After carefully reviewing the arguments advanced by Rhonda and the law guardian in light of the record and applicable legal principles, we are convinced there is substantial credible evidence supporting the court's findings of fact and legal conclusion that it was in Robert's best interests to terminate both parents' parental rights. We address the four statutory prongs in turn.

A. Prong One.

The first prong requires the Division to establish that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Children and Families v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352).

The harm need not be physical, as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992). The

8

focus of the harm is not on an isolated incident, but rather "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. "Moreover, '[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.'" Dep't of Children and Families, Div. of Child Protection and Permanency v. E.D.-O., 223 N.J. 166, 178 (2015) (alteration in original) (quoting In re Guardianship of DMH, 161 N.J. 365, 383 (1999)).

The harm may be established by "a delay in establishing a stable and permanent home[.]" DMH, 161 N.J. at 383. "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379. Additionally, a parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child] . . . . constitutes a parental harm to that child arising out of the parental relationship [that is] cognizable under N.J.S.A. 30:4C-15.1(a)(1) and (2)." Id. at 380-81.

The court concluded the first prong was established because Robert was harmed by Rhonda's inability to provide a safe and stable home for him and her failure to address her longstanding drug addiction. In addition, the court found

that Rhonda harmed Robert by engaging in criminal activity that resulted in her incarceration.

Rhonda argues that the court's finding that she endangered Robert or will endanger him in the future was an inappropriate, categorical judgment. In addition, she argues the court erred by failing to give appropriate weight to her "bonded parental relationship" with Robert prior to her incarceration, and the fact that she completed inpatient and intensive outpatient drug rehabilitation programs, resulting in extended periods of sobriety.

The record clearly and convincingly supports the court's decision, which was based on Rhonda's "track record" since Robert was born, illustrating her serious history of drug abuse, instability, homelessness, and incarceration. After Robert was born, Rhonda left the hospital and was missing for two weeks, she never visited him during his three week hospital stay, and never named him. When she was located, Rhonda was addicted to heroin and homeless. Despite her periods of sobriety, she relapsed more than once. In May 2007, she was incarcerated on drug charges and did not visit Robert until January 2008, even though she entered the Integrity House substance abuse program in September 2007 and had the ability to see him. She was incarcerated again in 2012, and the person she arranged for to care for Robert could not cope with his behavioral

A-2083-17T3

issues, resulting in the Division taking custody of him. The court found Miller credible when he opined that Robert's behavioral issues were proximately caused by Rhonda's instability.

B. Prong Two.

"The second prong, in many ways, addresses considerations touched on in prong one." F.M., 211 N.J. at 451. The focus is on parental unfitness. K.H.O., 161 N.J. at 352; DMH, 161 N.J. at 378-79. In considering this prong, the court "should 'determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the child[.]'" N.J. Div. of Youth and Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth and Family Servs. v. A.W., 103 N.J. 591, 607 (1986)). The second prong may be satisfied by:

> by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.
>
> [K.H.O., 161 N.J. at 353.]

"Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with

foster parents.'" F.M., 211 N.J. at 451 (alteration in original) (quoting K.H.O., 161 N.J. at 363).

Based upon credible expert testimony, including the expert testimony proffered by Rhonda's expert, Figurelli, the court found she was unable to parent Robert at the time of trial, and she would need to maintain a period of sobriety after being released from prison before being a viable caregiver. In addition, the court accepted Miller's opinion that Rhonda's prognosis was poor, and she is at risk to relapse upon her return to the community given her past unsuccessful attempts and lack of ability to understand its negative impact on Robert.

Our review of the record leads us to conclude there is sufficient credible evidence supporting the court's finding that the Division satisfied the second statutory prong by clear and convincing evidence. These findings are compounded by Rhonda's incarceration and her inability to provide Robert with the stable home he desperately needs in the face of his serious behavioral issues.

C. Prong Three.

Under prong three, the court must consider whether the Division "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[.]" N.J.S.A. 30:4C-15.1(a)(3). The Division's efforts must be analyzed "with reference to

12

the circumstances of the individual case[,]" including the parent's degree of participation. DMH, 161 N.J. at 390.

N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts by an agency authorized by [the Division] to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]" The statute sets forth examples of "reasonable efforts," including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [Ibid.]

The court found that the Division provided numerous services to Rhonda in an attempt to reunify her with Robert even when she was incarcerated. The Division identified a residential substance abuse treatment program at Integrity House, transitioned her to Eva's Village, and placed Robert in her care after her participation in a Mommy and Me program. Rhonda and the law guardian argue

that the Division did not provide services to Rhonda during her incarceration but our review of the record reveals that she was receiving services at EMCF, which Rhonda felt were sufficient. Despite Rhonda's denial as to her need for more intensive treatment, the Division persisted in offering services to address her drug abuse during her incarceration, facilitated psychological evaluations, kept her apprised of Robert's condition, arranged visitations with him, and phone contact.

Rhonda and the law guardian also challenge the Division's ruling out relatives to care for Robert. The record reflects that the Division explored relative placements but none could deal with Robert's behavioral problems. The severity of his issues is confirmed by the Division placing him in a residential treatment center, a partial hospitalization program, providing psychotropic medication and counselors. Robert's improved behavior when he had visits with his mother were temporal in nature. One proffered individual suggested for placement by Rhonda failed to appear in court to testify despite agreeing to do so. Rhonda's other designated individual lives in Texas, and she was denied interstate placement. Robert's current placement was found capable of meeting his needs, having experience with psychiatric issues and aggressive behavior. We find no support in the record for Rhonda and the law guardian's contention

14

that the Division failed to consider alternative placements for Robert, and the judge correctly concluded that the Division satisfied prong three by clear and convincing evidence.

D. Prong Four.

The fourth prong requires the Division to show "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Termination of parental rights poses a risk to children due to the severing of the relationship with their natural parents, but it is based "on the paramount need the children have for permanent and defined parent-child relationships." K.H.O., 161 N.J. at 355 (quoting In re Guardianship of J.C., 129 N.J. 1, 26 (1992)).

Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. Prong four "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. "[T]he question to be addressed under [prong four] is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from permanent disruption of her relationship

with her foster parents." I.S., 202 N.J. at 181 (quoting In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002)).

Generally, to prove the fourth prong, the Division "should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 281 (2007)); see also R.G., 217 N.J. at 564 (finding the Division's position lacked support because "no bonding evaluation was conducted"); N.J. Div. of Youth and Family Servs. v. A.R., 405 N.J. Super. 418 (App. Div. 2009) (affirming an order denying the termination of parental rights where no bonding evaluation was conducted).

The court accepted Miller's testimony that Robert "would suffer greater harm from lack of permanency now at the age of almost eleven," than he would by severing his relationship with Rhonda. He lived with her for less than three years, and his multiple placements are not "healthy," as aptly pointed out by the court, because Robert needs "nurturing adults" in his life. Burr and Figurelli's opinions were found to be "faulty" by the court because Burr inaccurately opined that Rhonda was Robert's primary parental figure but conceded an appropriate

16

caregiver could mitigate harm to Robert. Figurelli "could not articulate any circumstances under which he would recommend termination of parental rights," and the court rightfully rejected his opinion as "unbelievable" on its face. Miller's expert testimony provides clear and convincing evidence that the Division established the fourth prong of the best interests of the child test.

The court reviewed the evidence presented at the trial, made detailed factual findings as to each prong of N.J.S.A. 30:4C-15.1(a), and thereafter concluded the Division met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship as to both defendants. The court's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), accords with F.M., 211 N.J. 420, E.P., 196 N.J. 88, K.H.O., 161 N.J. at 347-48, DMH, 161 N.J. 365, and A.W., 103 N.J. 591, and is more than amply supported by the record. F.M., 211 N.J. at 448-49.

We also conclude that the court appropriately denied Rhonda's motion for parenting time pending appeal, and that issue is now moot.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION