# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2092-24
           A-2187-24
           A-2189-24
           A-2190-24

E.S.,[1]

    Plaintiff-Appellant,

v.

D.E.S.,

    Defendant-Respondent.

_____

E.S.,

    Plaintiff-Appellant,

v.

J.G.S.,

    Defendant-Respondent.

_____

Argued January 14, 2026 – Decided March 24, 2026

---

[1] We use pseudonyms to protect the domestic violence victim's privacy. R. 1:38-3(d)(10).

Before Judges Mayer, Paganelli and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket Nos. FV-02-1460-25, FV-02-1461-25, FV-02-1864-25, and FV-02-1865-25.

Angelo Sarno argued the cause for appellant (Sarno Da Costa D'Aniello Maceri Webb, attorneys; Angelo Sarno, of counsel and on the briefs; Lydia LaTona, on the briefs).

Remi L. Spencer argued the cause for respondents (Pashman Stein Walder Hyden, PC, attorneys; Remi L. Spencer, of counsel and on the brief).

PER CURIAM

In these appeals, heard back-to-back, plaintiff (Emma) contends the Family Part erred in dissolving two amended temporary restraining orders (ATROs) issued on her behalf pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. She subsequently applied for two new temporary restraining orders (TROs) against the same parties under the PDVA and contends the Family Part erred in denying those applications. Based on well-established law, we reverse the dissolution of the January 17, 2025 ATROs, require the ATROs be immediately reinstated, and remand for further proceedings consistent with this opinion. Because we reinstate the ATROs,

Emma shall be permitted to amend the ATROs to include the allegations contained in the denied February 24, 2025 TROs.

"We review the Family Part judge's [factual] findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Therefore, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 283 (quoting Cesare, 154 N.J. at 411-12).

"[W]e do not pay special deference to its interpretation of the law . . . . [T]he trial court is in no better position than we are when interpreting a statute or divining the meaning of the law." Ibid. (second alteration and omission in original) (quoting D.W. v. R.W., 212 N.J. 232, 245 (2012)). Thus, "we review the trial court's legal conclusions de novo." Ibid. (quoting D.W., 212 N.J. at 245-46); see also Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294 (2017) ("In matters of statutory interpretation, [appellate review] is de novo."). Moreover, "a 'trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (quoting Town of Kearny v. Brandt, 214 N.J. 76, 92 (2013)) (internal quotation marks omitted).

A-2092-24

Our "methodology" regarding the interpretation of the "rules mirrors the manner in which statutes are construed." Hopewell Valley Citizens' Grp., Inc. v. Berwind Prop. Grp. Dev. Co., L.P., 204 N.J. 569, 577-78 (2011). We begin with the statute's and rule's "plain language." Id. at 578. We "must 'ascribe to the [words . . .] their ordinary meaning and significance . . . and read them in context with related provisions so as to give sense to the . . . whole.'" Ibid. (alteration and second omission in original) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). Our analysis is conducted "in a common-sense manner." N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 512 (App. Div. 2015) (quoting State in Interest of K.O., 217 N.J. 83, 91 (2014)). "A 'common-sense approach often begins with an examination of dictionary definitions.'" State v. Brown, 463 N.J. Super. 33, 49 (App. Div. 2020) (quoting Cypress Point Condo. Ass'n v. Adria Towers, LLC, 226 N.J. 403, 426 (2016)).

Because these appeals concern the Family Part judge's application of the PDVA and the rules of court, we begin with their plain language and structure. Under the PDVA,

> a. A victim may file a complaint alleging the commission of an act of domestic violence with the Family Part of the Chancery Division of the Superior Court in conformity with the Rules of Court. . . .

4

[A] victim may file a complaint before a judge of the Family Part of the Chancery Division of the Superior Court or a municipal court judge . . . .

. . . .

f. A plaintiff may seek emergency, ex parte relief in the nature of a [TRO]. A municipal court judge or a judge of the Family Part of the Chancery Division of the Superior Court may enter an ex parte order <u>when necessary to protect the life, health or well-being of a victim on whose behalf the relief is sought.</u>

g. If <u>it appears that the plaintiff is in danger of domestic violence</u>, the judge shall, upon consideration of the plaintiff's domestic violence complaint, order emergency ex parte relief, in the nature of a [TRO]. A decision shall be made by the judge regarding the emergency relief forthwith.

. . . .

i. <u>An order for emergency, ex parte relief shall be granted upon good cause shown</u> and shall remain in effect until a judge of the Family Part issues a further order. . . .

[N.J.S.A. 2C:25-28 (emphasis added).]

"Good cause" is not defined in the PDVA. Black's Law Dictionary defines "good cause" as "[a] legally sufficient reason" or "the burden placed on a litigant . . . to show why a request should be granted or an action excused." <u>Black's Law Dictionary</u> 275 (12th ed. 2024).

A-2092-24

The Legislature empowers "[t]he Supreme Court [to] promulgate Rules of Court to effectuate the purposes of" the PDVA. N.J.S.A. 2C:25-29.3. Under Rule 5:7A,

> (a) [TRO]. In court proceedings instituted under the [PDVA] . . . the judge shall issue a [TRO] when the applicant <u>appears to be in danger of domestic violence</u>. The order may be issued ex parte when necessary to protect the life, health, or well-being of a victim on whose behalf the relief is sought.
>
> . . . .
>
> (c) . . . <u>If it appears that the applicant is in danger of domestic violence</u>, the judge shall, upon consideration of the applicant's domestic violence affidavit, complaint or testimony, order emergency relief, including ex parte relief, in the nature of a [TRO] as authorized by N.J.S.A. 2C:25-17 . . . . In order to be eligible for a [TRO], the applicant must qualify as a "victim of domestic violence" as defined by N.J.S.A. 2C:25-19(d).
>
> [(Emphasis added).]

In construing the statute and Rule as a whole, an ex parte TRO shall be issued when a plaintiff establishes "good cause," N.J.S.A. 2C:25-28; demonstrates the TRO is "necessary to protect the life, health or well-being of a victim," N.J.S.A. 2C:25-28(f); and "it appears that the plaintiff is in danger of domestic violence," N.J.S.A. 2C:25-28(g); R. 5:7A(a)(c).

6

Nevertheless,

> Any temporary order hereunder is immediately appealable for a plenary hearing de novo not on the record before any judge of the Family Part of the county in which the plaintiff resides or is sheltered if that judge issued the temporary order or has access to the reasons for the issuance of the temporary order and sets forth in the record the reasons for the modification or dissolution.
>
> [N.J.S.A. 2C:25-28(i) (emphasis added).]

"Plenary" is defined as "[f]ull; complete; entire," Black's Law Dictionary 1397 (12th ed. 2024); and a "hearing" is defined as "[a] judicial session, . . . held for the purpose of deciding issues of fact or of law." Id. at 861. "De novo" means:

> Anew, afresh, or over again. When a court engages in de novo consideration of a legal issue, it makes an independent determination without deference to any earlier analysis about the matter. It is treated as if no previous decision had been made: there is no presumption of the correctness or validity of any prior finding, recommendation, or conclusion.
>
> [Id. at 548.]

"The statutory availability of an appeal appears to be designed to balance the fact that TROs are most often issued ex parte, without notice to the defendant, with the fundamental procedural due process rights of all litigants, particularly in light of the consequential relief most often granted in" TROs.

7

Vendetti v. Meltz, 359 N.J. Super. 63, 68 (Ch. Div. 2002). We recognize "some people may attempt to use the [ex parte] process as a sword rather than as a shield." Cesare, 154 N.J. at 416 (quoting State v. Hoffman, 149 N.J. 564, 586 (1997)).

If no appeal is taken or it is denied, the Rule requires that "[a] hearing for a final restraining order [(FRO)] . . . be held in the Superior Court within 10 days of the filing of an application. A[n FRO] restraining a defendant shall be issued only on a specific finding of domestic violence." R. 5:7A(e).

When determining whether to grant an FRO, "where the jurisdictional requirements have otherwise been met," a trial court must conduct two inquiries. Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). "First, the [court] must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:15-19(a) has occurred." Ibid. "Second, if a court finds a predicate act occurred, 'the [court] must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence.'" T.B. v. I.W., 479 N.J. Super. 404, 412-13 (App. Div. 2024) (quoting D.M.R. v. M.K.G., 467 N.J. Super. 308, 322 (App. Div. 2021)). The PDVA "tests a victim's entitlement to relief in accordance with the preponderance of the evidence standard,

consistent with the lowered burden of proof appropriate in a civil proceeding."

J.D. v. M.D.F., 207 N.J. 458, 474 (2011). "The term 'preponderance of the evidence' means that amount of evidence that causes you to conclude that the allegation is probably true. To prove an allegation by the preponderance of the evidence, a party must convince you that the allegation is more likely true than not true. . . ." Model Jury Charges (Civil), 1.12H, "Preponderance of the Evidence" (approved Nov. 1998). The preponderance of the evidence standard has been described as "heavier" than a good cause standard. See C.R. v. M.T., 257 N.J. 126, 159 (2024) (Fasciale, J., concurring).

Applying this well-established framework, we consider plaintiff's appeals.

Dismissal of ATROs

On December 31, 2024, Emma filed nearly identical "civil complaints" and applications for TROs against D.E.S. (Donald) and J.G.S. (Julie), her parents, with whom she had previously resided. Emma stated that defendants

> ha[d] engaged in a pattern of behavior meant to alarm and harm her. The pattern of harassment has continued over the past, approximately, 10 months. It has culminated with the constant physical surveillance of [Emma] by investigators hired by the defendant[s. Emma] alleges that the actions of these investigators have placed her and her son in danger, and have caused a tremendous strain on her mental health. [Emma] alleges that the defendant[s] ha[ve] also withheld funds from her. [Emma] alleges that due to

9

the withholding of these funds she is sometimes left without enough money to buy food for her and her children.

[(Capitalization modified).]

Emma alleged that defendants' actions were "harassment" under the PDVA.[2]   In addition, she alleged there was a "prior history of domestic violence," including "multiple unreported acts of harassment."  (Capitalization modified).

The municipal court judge

> established jurisdiction over the subject matter and the parties pursuant to [the PDVA] and . . . found good cause that a prima facie act of domestic violence ha[d] been established; that an immediate danger of domestic violence exists and that [Emma]'s life, health and well[-]being are endangered; [and] that an emergency restraining [o]rder is necessary pursuant to R[ule] 5:7A(b) and N.J.S.A. 2C:25-28 to prevent the occurrence or recurrence of domestic violence.

As part of the TRO, the judge prohibited defendants from "returning to the scene of [the] violence"; "future acts of domestic violence"; "having any oral, written, personal, electronic, or other form of contact or communication with [Emma and others]"; "making or causing anyone else to make harassing

_____

[2]   Under N.J.S.A. 2C:25-19(a)(13), "domestic violence" includes the act of "harassment" as defined in N.J.S.A. 2C:33-4.

communications to[ Emma and others]"; "stalking, following or threating to harm, stalk or follow[ Emma and others]"; and causing anyone else to harm, stalk or follow [Emma and others]." (Capitalization modified). Defendants were also barred from Emma's residence and places of employment.

In addition, defendants were "prohibited from possessing any and all firearms or other weapons and must immediately surrender these firearms, weapons, permit(s) to carry, application(s) to purchase firearms and firearms purchase ID card[s] to the officer serving this" TRO. (Emphasis omitted).

Emma was awarded "[e]mergent support" and granted temporary possession of a 2024 Range Rover and a Jeep Wagoneer, and "exclusive possession" of the residence listed on the TRO.

On January 9, 2025, defendants moved to dismiss the TROs pursuant to N.J.S.A. 2C:25-28(i). In support of their motion, defendants relied upon their attorney's letter brief and certification. Defendants' attorney certified she was "fully familiar with the facts." In addition, counsel attached to her certification copies of a complaint dated November 7, 2024, which was verified by Donald and Julie, and an amended complaint, dated December 27, 2024, which was not verified, filed by defendants in pending grandparent visitation matters.

11

As part of the motion to dismiss the TROs, defendants included a December 24, 2024 certification from a New Jersey licensed private investigator, which was captioned in the grandparent visitation matters. He stated "[s]urveillance of [Emma] was conducted on multiple dates" in November and December 2024, "as detailed in surveillance reports attached." The attached surveillance reports contained photographs and links to videos that depicted Emma, and others, traveling to various locations, including hotels and houses.

Moreover, counsel attached a copy of Julie's certification, dated December 27, 2024, which was filed in a separate civil litigation matter involving the trust established for Emma. According to the certification, Julie was a co-trustee. In her certification, she stated: (1) Emma had "dissipat[ed] . . . millions of dollars over the last few years[, which wa]s . . . unsustainable for the [t]rust" and, as she understood from medical professionals, this dissipation was also "threatening [Emma]'s health and well-being"; (2) the co-trustees have "exclusive discretion [and] . . . may distribute to [Emma] the money that [they] think would reasonably support her and advance her well-being" (emphasis omitted); (3) she "never told [Emma] that her father and [she] wanted [Emma] to stop working so that [Emma] could be a stay-at-home mother," but instead they "continue[d] to want her to be [a] successful professional"; (4) Emma's

12

"phone records showed that she [had] made hundreds of phone calls" to a physician despite telling Donald she had not; (5) after meeting with doctors, Emma's acquaintances, and the co-trustee, a decision to "cease distributions of discretionary cash" was made; (6) she had "no objections to [Emma] getting a divorce for legitimate reasons and have not taken her husband's side in the divorce"; (7) to avoid Emma's default under her and her husband's prenuptial agreement, she and Donald "provided [Emma's husband] . . . with a townhouse to live in [in] Englewood"; and (8) "[d]ue to [her] concerns about [Emma's] erratic behavior," including "spending a significant amount of time with and likely [being] in a romantic relationship with" a man who was charged with "promoting an obscene sexual performance by a child; possessing an obscene sexual performance of a child; . . . unlawful surveillance"; and "transportation and possession of child pornography" "the trustees decided to have [thei]r lawyer hire a private investigator to follow" Emma.

Also, attached to the motion, again captioned in the trust litigation and dated December 27, 2024, was a certification from the co-trustee. The co-trustee stated he understood Donald and Julie "had met with multiple doctors to discuss" Emma and he "joined a zoom meeting with one of the doctors." The co-trustee stated he was concerned with Emma's honesty and "her ability to manage

13

money," and was "uncomfortable with the lifestyle [Emma] was leading." He stated that he and Julie had agreed to suspend Emma's trust distributions.

Emma submitted an undated certification in opposition to the motion to dismiss the domestic violence matters. Emma certified: (1) she need[ed] the [c]ourt's protection to cease [defendants'] psychological, emotional and financial abuse"; (2) defendants "acted in concert with [her husband] to keep tabs on [her] whereabouts, obtain personal medical information about [her] without [her] knowledge or consent, constructively terminated her employment . . ., withheld funds from [her t]rust to coerce [her] into actions"; (3) "defendants . . . ramp[ed] up their emotional harm to [her] with surveillance"; and (4) the "cameras in [her] home have been used to watch [her] inside [her] home by [her husband] and same was orchestrated against [her] consent by [d]efendants."

On January 17, 2025, Emma applied to amend both TROs.[3] As to Donald, she added allegations regarding predicate acts that included:

> Upon my marriage to my current husband, [Donald] told me he would financially provide for me with trust distribution payments from a trust he had established for my benefit prior if I gave up working outside of the home and was a stay-at-home mother with my child. Relying on [Donald]'s explicit promise, I left my career, became a stay-at-home mother and [Donald] abided by

---

[3] Although the ATROs were filed after the motion to dismiss, the judge considered the additional predicate acts alleged.

A-2092-24

his promise of providing distributions where I did not have to work anymore for more than 2 years uninterrupted and without issue. Over the last 2 years, I informed [Donald] of the physical, emotional[,] and mental abuse I was experiencing at the hands of my husband. I asked for permission to divorce my current husband (a "get") based upon the abuse that was being inflicted and as required in our religion. [Donald] threatened that if I filed for divorce, he would cease making the trust payments while knowing that it was my only source of income. When I filed anyway, [Donald] ceased all funds to me under the trust, isolating and subjecting me to more abuse and coercing me into his will. Two examples include June 2024, after [Donald] coerced me into moving from New York City to a mansion in Englewood, New Jersey, and then re[s]tricted my ability to be ga[in]fully employed or to start my own business by destroying my relationships and in October 2024, [Donald] required me to remain in my abusive marriage, subjecting me to my husband repeatedly physically hurting me and stalking with [Donald]'s help given [Donald]'s financial control when I filed for divorce against h[is] permission. [Donald] harassed, monitored, tracked and stalked me, from when he encouraged my husband to do so months ago th[r]ough to December on his own as well. He admitted to funding surveillance through my trust. By November 2024, my fear grew as I could tell I was being followed when I left my home. I also noticed people parked outside of my home for hours at a time that did not belong there, I was followed by these persons to various towns and other states for weeks throughout November and December, all the while causing me fear and such interactions proved to also be dangerous when one car almost caused me physical injury. [Donald] was aware of my TRO against my husband because when my husband was removed from my home in Englewood, [Donald] took my husband into his home for 3 days and

15

then gave my husband the keys and permission to stay at my sister's home in Englewood just minutes away from me with a TRO against him. During the time, the stalking and monitoring increased of me but including following outside of their cars, following colleagues, including my counsel. [Donald] also ordered and paid the provider of my in-home security cameras to provide him and my husband access to viewing the cameras inside my home against my direct wishes to this provider. . . .

[(Capitalization modified).]

In addition, Emma amended her description of prior acts of domestic violence to include:

In November 2021, while I was an employee of one of [Donald]'s companies, and he directed the deputy general counsel to unlawfully gain access to my health benefits records without my knowledge or consent. Thereafter, [Donald] also instructed my husband to search for my prescription medications without my knowledge or consent.

[]I discovered that [Donald] had been monitoring my personal cell phone calls made without my knowledge or consent. [Donald] also used my private information to access my private banking information and monitor my account activity without my knowledge or consent.

[]In 2023, [Donald] coerced me to return to his company and refused to pay me my W2 compensation at my previous wage rate despite my repeated requests to appropriately compensate me. When I discovered criminal activity in the company, brought it to [Donald]'s attention and was constructively discharged in April 2024. [Donald] then coerced me to move to

16

Englewood[,] New Jersey from New York City with his financial control over me and to retaliate against me.

[]I sought to start my own business and [Donald] ordered me to cease. He commenced to call me names like "crazy" and "mental[.]"[] At that time, he also threatened to cease trust distributions if I did not see his hand-picked therapist over the therapist[] I had seen prior of my choice. In June[,] he stopped a distribution payment until I complied by seeing his hand-picked therapist that he had previously spoken with, demanding that I give up my business idea.

[(Capitalization modified).]

The amendment also stated:

In addition to using economic coercion by ceasing my trust payments until the Chancery Court recently ordered him to resume payments, [Donald] is also using his unlimited resources to engage in scorched earth litigation to traumatize me and my children. One example is his litigation for grandparents' rights wherein [Donald] served legal papers on me on Chanukah and the Sabbath in front of my 14-year-old-son who was traumatized by his own grandfather's decision to do so during what was supposed to be one of the happiest holidays. The irony of [Donald] serving legal papers seeking time with my son on that day after cutting off our only source of income cemented in my son's decision not to see [Donald], notwithstanding the grandparents['] rights complaint. The complaint contains false allegations of me personally and professionally, and it represents one example of [Donald]'s successful attempts to isolate and marginalize me.

[(Capitalization modified).]

17

Aside from her allegations of harassment, Emma added allegations that Donald's actions constituted stalking[4] and criminal coercion[5] under the PDVA.

Also on January 17, 2025, Emma applied to amend her TRO against Julie. As to Julie, she added allegations regarding predicate acts that included:

> [Julie] told me she would financially provide for me with trust distribution payments from a trust she and my father had established, and she serves as a trustee on if I gave up on working outside of the home and became a stay-at-home mother. Relying on [Julie]'s explicit promise, I left my career[ and] became a stay-at-home mother. [Julie] felt very strongly that my role should . . . be[] a "good wife" to my husband[.] I complied with [Julie] and [he]r instructions to not work. Knowing the abuse [at] the hands of my husband, [Julie] would not grant me permission to divorce. When I filed for divorce all financial support ceased to coerce me into her will not mine. Two examples include that in June 2024, when [Julie] coerced me to move from New York City to a mansion in Englewood, New Jersey and then restricted my ability to be ga[in]fully employed or start my own business by destroying my relationships and in October 2024, [Julie] required me to remain in my abusive marriage, subjecting me to my husband repeatedly physically hurting me with financial control when I filed for divorce against her permission.

---

[4]  Under N.J.S.A. 2C:25-19(a)(14), "domestic violence" includes the act of "stalking" as defined in N.J.S.A. 2C:12-10.

[5]  Under N.J.S.A. 2C:25-19(a)(15), "domestic violence" includes the act of "criminal coercion" as defined in N.J.S.A. 2C:13-5.

Over recent months, [Julie] worked with [Donald] and my husband to stalk, track and monitor me over months with surveillance outside of my home, persons following me everywhere and gaining access against my permission to my home cameras as examples. There were times such monitoring and following almost led to my physical injury from fear of being stalked.

[Julie] was aware of my TRO against my husband and [Julie] took my husband into her home for 3 days and then gave my husband the keys and permission to stay at my sister's home in Englewood just minutes away from me with a TRO against him. During the time, [Julie]'s stalking and monitoring increased with [Julie] ord[e]ring and funding these dangerous conditions upon me and intrusion of privacy.

[(Capitalization modified).]

In addition, Emma amended her description of prior acts of domestic violence to include:

[Julie] and [Donald] have a history of harassment and stalking me concerning medical[,] physical[,] and mental health, including violations of my HIPAA[6] rights. [Julie] contacted a therapist without my knowledge o[r] consent, both telephonically and via multiple emails in an effort to seek HIPAA protected health information. [Julie] attempted to inappropriately influence my therapist to convince me to remain in my abusive marriage and convince her that I was "crazy" and had a money sp[e]nding problem. My therapist refused to be unlawfully influenced.

---

[6] The Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320d-1 to -9.

[Julie] admitted to me that while acting in concert with [Donald, Donald] monitored my persona[l] cell phone call log reviewing the records of hundreds of personal phone calls of mine while, during[,] and after I worked for [Donald]'s company. [Julie] also used my private information like my social security number and date of birth to access my private banking information and monitor my account activity.

[(Capitalization modified).]

The amendment also included:

I sought to start my own business, and [Julie] ordered me to cease. She commenced to call me names like "crazy["] and "mental." She spread false allegations about me professionally and personally for years to isolate me to create more depend[e]nce on her and [Donald] for total control over me. In addition to using economic coercion by ceasing my trust payments until the Chancery Court recently ordered her to resume payments [, Julie] is also using her unlimited resources to engage in scorched earth litigation to traumatize me and my children. One example is her litigation for grandparents' rights wherein [she] served legal papers on me on Chanukah and the Sabbath in front of my 14-year-old son who was traumatized by his own grandmother's decision to do so during what was supposed to be one of the happiest holidays. The irony of [Julie] serving legal papers seeking time with my son on that day after cutting off our only source of income cemented in my son his decision not to see [Julie], notwithstanding the grandparents['] rights complaint. The complaint contains false allegations of me personally and professionally, and it represents one example of [Julie]'s successful attempts to isolate and marginalize me.

A-2092-24

[(Capitalization modified).]

Emma added allegations that Julie's actions constituted stalking and criminal coercion under the PDVA.

As to both applications for ATROs, the Family Part judge, as did the municipal court judge, "established jurisdiction," and

> found good cause that a prima facie act of domestic violence ha[d] been established; that an immediate danger of domestic violence exists and that [Emma]'s life, health and well[-]being are endangered; [and] that an emergency restraining [o]rder is necessary pursuant to R[ule] 5:7A(b) and N.J.S.A. 2C:25-28 to prevent the occurrence or recurrence of domestic violence.

The Family Part judge granted the ATROs and continued the prior prohibitions, grants, and awards and scheduled the FRO hearing for January 30, 2025.

On January 30, 2025, in a decision placed on the record, a different Family Part judge stated she was "not hearing th[e motion] under a civil standard motion to dismiss." Instead, citing N.J.S.A. 2C:25-28(i), the judge noted it was a "plenary hearing de novo." The judge stated, "due process requirements have been met because" Emma was provided "notice." The judge noted the parties exchanged certifications, although "not necessarily testimony," and she "considered th[e] . . . certifications under oath." Both parties were represented

by counsel, and the judge permitted the attorneys "to argue [their] respective points."  Neither party objected to the procedure of the hearing.

The judge stated there were "two concepts that have to be demonstrated under the law.  The first is whether or not there's an articulable act of domestic violence that has been described.  And . . . some specificity so the person can prepare to defend it."

The judge stated, with regard to the actions of the investigators, that they were "not within necessarily the control of" defendants.  The judge stated Emma "emphasizes extensively, how she feels and what is happening to her as a result of the surveillance . . . the actions of the actual" private investigators and not defendants.  Moreover, the judge noted the allegation that defendants had "withheld funds."

The judge found:

> [B]y [Emma]'s own testimony, by her own certification, [defendants] are surveilling her because they think she's doing X, Y, Z.  Whether it's nefarious or not nefarious, or of concern, of regarding whatever it is they think she is doing, not to harass her.  They're surveilling her as part of a bigger picture because they are dealing with these other issues which are the financial issues.  So it's not articulated that they are doing whatever they are doing with [the] purpose to harass her.

A-2092-24

As to stalking, the judge found Emma "explain[ed] that all of these other issues [are] going on, there's [defendants'] visitation rights . . ., the Chancery Division [action], . . . and that she's not receiving money." The judge concluded Emma "doesn't meet the stalking statute even by [a] prima facie showing, really by her own testimony." The judge noted "stalking wasn't part of th[e] original testimony." The judge further found there was no criminal coercion because, although she understood Emma felt manipulated, "trust beneficiaries don't actually have control."

Therefore, the judge concluded that "on a de novo review" there was no "articulable act of domestic violence when [Emma] filed or through the amendment." The judge considered Emma's allegations regarding the parties' history of domestic violence and stated they did not provide "specificity"; " a date"; "a time"; "a location"; or "even . . . examples."

The judge considered "the second component," whether the need to protect Emma established "an emergency." The judge found there was no emergency because Emma alleged she was being "monitored in some ways for months." The judge found there was no "need to block defendants from contacting [Emma], because they're not . . . really communicating with her." Further, "[t]he money [wa]s being dealt with. . . ."

A-2092-24

The judge granted defendants' motion to dismiss Emma's ATROs. The orders stated the ATROs were dismissed because "the burden of proof ha[d] not been met."

On appeal, Emma argues she established "good cause" for the grant of the ATROs. Emma argues she facially established harassment and stalking through the investigators' "constant" surveillance and defendants' access to her "in-home security cameras." Further, she argues she facially established criminal coercion through defendants' "withhold[ing of] funds from her trust" and physical surveillance. She contends the judge erred by depriving her of an "[FRO] hearing where the credibility and assertions of the [d]efendants could be challenged."

For the following reasons, we conclude the judge erred in dismissing the ATROs. First, the judge's analysis of Emma's initial TRO and ATRO was too narrow. The judge focused on Emma's allegations of private investigator surveillance. However, as to Donald, she also alleged he: engaged in monetary coercion; used—without her consent—cameras in her home to "watch" her; "unlawfully gain[ed] access to [her] health benefits records"; "monitor[ed her] personal cell phone calls"; "access[ed her] private banking information and monitor[ed her] account activity"; and called her "crazy" and "mental." As to

24

Julie, in addition to surveillance, Emma alleged she: engaged in financial coercion and "gain[ed] access against [her] permission to [her] home cameras." The judge erred by not analyzing each allegation against the predicate acts pleaded.

Second, the judge concluded Emma's allegations concerning the parties' history of domestic violence failed because they lacked specificity. However, in the ATRO against Julie, Emma alleged: HIPPA violations; that Julie had "admitted" to "acting in concert" with Donald to "monitor" and "review" her "cell phone call log"; used her private information to access her banking information and monitor her account; called her names; and served her with legal process on a holiday. These allegations may lack dates, but they offer sufficient specificity for the court to consider the parties' circumstances and sufficiently plead a history of domestic violence. See J.D. v. M.D.F., 207 N.J. 458, 479 (2011) ("[P]laintiffs seeking protection under the [PDVA] often file complaints that reveal limited information about the prior history between the parties, only to expand upon that history of prior disputes when appearing" for an FRO hearing.).

Third, the judge found, as to Emma's allegations regarding private investigator surveillance, she failed to establish defendants' "purpose" was to

harass her because she acknowledged the surveillance was related to other litigation regarding grandparent visitation and the trust. Again, we conclude the judge's focus was too narrow. "[I]n evaluating claims of domestic violence, an individual can have [more than] one motive or intent." J.D., 207 N.J. at 487-88. "[D]omestic violence often presents circumstances in which a party may mask an intent to harass with what could otherwise be an innocent act." Id. at 488.

Further, orders under the PDVA prohibit not only the perpetrators themselves, but "prohibits [the perpetrators] from making or causing anyone else to make harassing communications to" or "from making or causing anyone else to threaten to harm, stalk, or follow" the victim.

Emma's allegation of harassing surveillance versus defendants' assertion of innocent surveillance necessitates credibility determinations, which are issues for the FRO hearing and should not have been grounds to dismiss the ATROs. We by no means opine that the use of private investigators to support litigation efforts amounts to a predicate act of domestic violence. However, every situation is unique and at this early stage, with the parties offering opposing views regarding the purpose of the surveillance, and considering Emma's other allegations, dismissal was improper.

A-2092-24

Fourth, the judge rejected Emma's allegations regarding the withholding of the trust funds because "trust beneficiaries don't actually have control." However, the basis for this conclusion is not explained. Moreover, defendants admitted ceasing payments, albeit for other reasons, which presents issues of credibility and motive best left for an FRO hearing.

Finally, we conclude the judge erred in determining that because the surveillance had been ongoing, Emma could not establish an emergent need for protection. The PDVA provides for the issuance of FROs to "prevent[] further abuse," N.J.S.A. 2C:25-29(a)(7) and N.J.S.A. 2C:25-29(b); and the courts must consider whether there is a "previous history of domestic violence" between the parties, N.J.S.A. 2C:25-29(a)(1). Therefore, Emma's allegations that the surveillance had been ongoing should not have provided the basis for the dismissal of the ATROs.

We offer no opinion regarding the merits of Emma's allegations. We merely conclude her ATROs should not have been dismissed and she should have been permitted to proceed to FRO hearings. See N.J.S.A. 2C:25-29.

27

Denial of TROs

On February 24, 2025, Emma filed identical "civil complaints" and applications for TROs against Donald and Julie.  In her complaints, Emma stated that:

> [She] became aware the def[endants] w[ere] still having a non-licensed private investigator surveille, stalk, harass and monitor her.
>
> [Emma] further reports that she has seen multiple different cars parked outside her home for lengthy periods of time with the person star[]ing in the front and back windows of [her] home.
>
> [Emma] reports she is monitored, tracked and followed everywhere she goes.
>
> [Emma] reports that def[endants] ha[ve] been working with her husband to coerce and manipulate her. Def[endants] also use[ her] husband to get personal information about [her].
>
> [(Capitalization modified).]

Emma alleged that defendants' actions constituted harassment, stalking, and criminal coercion under the PDVA.  In addition, she alleged there was a "prior history of domestic violence," including:

> History of def[endants] stalking, harassing, monitoring, tracking and following [her].
>
> Def[endants] ha[ve] obtained illegal access to [her] security camera to monitor [her].

A-2092-24

Def[endants] ha[ve] downloaded surveillance videos of [Emma] and [her] children [and] made [her] aware [they] ha[ve] watched the videos for [their] own pleasure.

[(Capitalization modified).]

In addition to the allegations contained in her complaints, the same Family Part judge who had dismissed Emma's January ATROs permitted Emma to explain, on the record, her concerns. Emma testified that the purpose of Donald's actions was to "control" her. In addition to her concerns regarding Donald's investigators, Emma explained that the security cameras in her home were "broken into" and she and her children were being "watched for several hours a day."

In an oral decision, considering the TRO application as to Donald, the judge stated:

> I cannot find that [Donald] himself has committed the act of harassment, criminal . . . coercion or stalking.
>
> I understand the private investigators and . . . their actions . . . that go perhaps . . . above and beyond in terms of how close they are to you, in terms of the children, in terms of the driving.
>
> That's not within necessarily [Donald]'s control but really by your own testimony, nothing says that [Donald] is doing this, utilizing the investigator, . . . using it in other forms of litigation with the purpose to harass you or that should cause you reasonable fear

29

because like your own testimony says, this has been going on for months and months.

You are aware that you are being surveilled by your own testimony, by the fact that this has been in litigation for months and these surveillance items or reports have been used in various forms of litigation that you have pending in other areas of the courthouse and that there is not a purpose to unlawfully restrict your freedom.

The purpose seemingly from your own testimony is to utilize these reports about what you're doing, whether that's right or wrong, in actions of grandparent visitation, whether or not they have that right or not is not before me, in actions in which they are the -- where [Donald] is the settlor . . . that's a litigation pending in the Chancery Division.

And they are, by their own admission and by your own testimony, utilizing their surveillance reports to do whatever it is they think is appropriate in that litigation. I am not making any judgment call. It may be completely inappropriate and you may have forms of relief under those other dockets, potentially the Chancery Division, given what I told you.

But I can't make the finding that it's a predicate act of domestic violence to utilize an investigator when the person utilizing them has control in theory over funds that you receive that are part of the subject of another litigation.

And I certainly can't find, even if there was a predicate act, that there is an imminent need for protection because by your own testimony this has been going on for many, many months and that you're well aware of it.

30

And again, there may be relief in the other litigation, there may be . . . criminal relief potentially but I can't make the finding that this requires the issuance of a [TRO] and I am denying this restraining order.

In addition, as to Emma's complaint regarding Julie, the judge "incorporat[ed her] findings and the recitation of the law from" Donald's complaint and "ma[d]e the same findings." The judge stated she could not "find that [Julie] has engaged in the predicate act of domestic violence, nor that there's an emergent need to protect [Emma] from imminent further abuse."

On appeal, Emma argues the court erred in denying her TRO applications. According to plaintiff the surveillance activities continued after dismissal of the ATROs. Emma asserts the judge erred in concluding Julie and Donald "had no control over the actions of the private investigators" and lacked the purpose to harass "simply because [they were] also using the surveillance in other litigation."

We conclude the Family Part judge erred as a matter of law in denying Emma's requests for TROs under the PDVA. First, the judge did not apply the "good cause" standard under N.J.S.A. 2C:25-28, and instead held Emma to a heavier burden of proof, stating "[she] can't make the finding" of "a predicate act of domestic violence." In addition, the judge denied Emma could have a

31

"reasonable fear because . . . this has been going on for months and months" and found Emma admitted defendants' purpose was solely for their other litigation. However, as we already stated, an allegation of ongoing domestic violence is not grounds to deny a TRO. Moreover, the judge misstated Emma's testimony, because Emma testified that defendants' "purpose" was to "control" her.

Second, the judge narrowly focused on the actions of the private investigators. Certainly, Emma's complaint referenced the actions of defendants' investigators, however, Emma testified to additional concerns, including the unauthorized utilization of the surveillance cameras in her home by defendants. Under these circumstances, the judge should have thoroughly considered all of Emma's allegations and permitted Emma to amend her complaint if necessary.

Third, "[t]he Legislature intended that the [PDVA] 'assure the victims of domestic violence the maximum protection from abuse the law can provide.'" G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2017) (quoting N.J.S.A. 2C:25-18)). Thus, it is of no moment to Emma that she may have other avenues of legal recourse against defendants, including potential criminal complaints.

32

We conclude the Family Part judge erred in denying Emma's February 24, 2025 applications for TROs and, therefore, remand for proceedings consistent with this opinion. We offer no opinion on the merits of plaintiff's domestic violence complaints.

On remand, the January 17, 2025 ATROs shall be immediately reinstated. Emma shall be permitted to further amend the ATROs to include the allegations in the denied February TROs. The FRO hearing shall be scheduled within thirty days.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

33

A-2092-24